16089

STATE v. HURT *ET AL.*

(48 S. E. (2d) 313)

462

*Mr. J. Perrin Anderson,* of Greenwood, for Appellant, Herbert Hurt,

*Messrs. Tinsley & McGowan,* of Greenwood, and *Blackwell, Sullivan & Wilson,* of Laurens, for Appellant, Tandy Wood,

*Messrs. Hugh Beasley,* Solicitor, and *W. H. Nicholson,* Assistant Counsel for the State, of Greenwood, for Respondent.

June 9, 1948.

BAKER, C. J.: At the June 1946, term of the Court of General Sessions for Greenwood County, the appellants, Herbert Hurt and Tandy Wood, were tried before a jury upon an indictment charging them with burglary and grand larceny. The indictment in substance charged them with breaking and entering the dwelling house of one L. V. Griffith, in the nighttime on May 22, 1945, and taking therefrom $22,400.00. The jury acquitted both of the appellants of the first count charging burglary, but convicted them on the second count, grand larceny. Whereupon, the trial Judge sentenced the appellants in the usual form to serve nine years and six months. It should be noted here that the indictment did not charge a conspiracy to commit either offense; neither did it charge either appellant with being an accessory before or after the fact, nor of receiving stolen property.

Upon the call of the case for trial, the appellants not being represented by the same counsel, the appellant, Hurt, made a motion for a separate trial on the ground that the defense of the two appellants (defendants) "will possibly be antagonistic; in fact, it appears very probable that a statement may be offered in evidence whereby one of the defendants would in some way implicate the other." There was no amplification of the ground, and the trial Judge in refusing the motion, said: "I don't think I could grant the motion on that showing. There is no showing as to what the statements are or would be, or as you just said, 'might be.' There is no showing here in addition to that statement that 'one of the defendants might make a statement that would involve him'."

The appellants have separately appealed from the refusal of the trial Judge to grant a severance, but of course the appellant, Wood, could not prosecute an appeal on this ground in that he did not move for a severance. However, a motion for a severance and separate trial is addressed to the discretion of the trial Judge, and no abuse of discretion has here been shown. *State v. Jeffords,* 121 S. C. 443, 114 S. E. 415; *State v. Bagwell,* 128 S. C. 414, 122 S. E. 513.

Appellants raise the issue that in the charge of the trial Judge to the jury, he violated Article 5, Section 26 of the Constitution in that he charged on the facts. The appellant, Hurt, takes the position that when the trial Judge instructed the jury "that if a person has money in his home or elsewhere upon which he has not paid income tax, it is still burglary and larceny to break into his home as I explained to you and steal and carry it away." And the appellants, Wood and Hurt, jointly complain of the instruction "that if two or more people have participated in the commission of a crime, where more than two people have committed it or participated in it, and one or two of them are brought into court and put on trial, if those being tried

are guilty of the crime charged, the fact that there is another or others who are not on trial and who might be equally guilty, that is no defense to those who are on trial."

We can see no error in this charge as both statements complained of are correct abstract propositions of the law, and were probably prompted by the testimony in the case, and possibly the arguments of counsel engaged in the trial. Indeed, counsel for the appellant, Hurt, states in his printed brief that the theory of the State was that the crime was the joint enterprise of the wife of the prosecutor, and of the appellants. Nor do we see how the portion of the charge jointly complained of by the appellants (or any other part thereof), could have been construed by the jury as an instruction to disregard the testimony from which an inference could be drawn that an illicit relationship existed between Wood and Mrs. Griffith, the wife of the prosecuting witness, L. V. Griffith, which relationship prompted Mr. Griffith, upon learning of such, to institute this prosecution against Wood; and that this charge conveyed to the minds of the jury that the trial Judge was of the opinion that the appellants were guilty regardless of whether there were others also guilty.

The learned trial Judge did no more than was his duty in informing the jury of the applicable law under the facts of this case, and was very careful to tell them in no uncertain terms that if he had said anything during the trial, or should say anything in his charge which they might think was an intimation as to how he thought the case should be decided, to dismiss such from their minds, because it was entirely their responsibility to pass upon the innocence or guilt of the appellants.

At the close of the State's case, the appellant, Wood, made a motion for a direction of verdict (of not guilty) as to him, which motion was denied. At the conclusion of the taking of all testimony in the case, the appellant, Wood, renewed

his motion for a direction of verdict (of not guilty). A similar motion was at this time made in behalf of the appellant, Hurt. The motions were refused, and as hereinbefore stated, the appellants were convicted of grand larceny. Following their conviction, the appellants made a motion for a new trial, and this motion was likewise refused.

There is no exception by the appellant, Hurt, to the denial of his motion for a direction of verdict of "Not Guilty," made at the conclusion of the taking of all testimony, but his exception is limited to the refusal of his motion for a new trial. The appellant, Wood, has excepted to the ruling of the trial Judge in refusing his motion for a direction of verdict of "Not Guilty," and from the refusal of his motion for a new trial.

The approach to a discussion of the testimony tending to show the guilt of the appellants is made more difficult by reason of the fact that it is necessary to consider separately, to a large extent, the testimony, if any, tending to connect either or both of the appellants with this larceny. That some one or more persons stole $22,400.00 from a small wall safe from the rural home of L. V. Griffith in Greenwood County, about one and one-half miles from Ware Shoals, breaking open a small safe in order to get said sum of money, and which was the property of L. V. Griffith, is not specifically denied by either of the appellants. However, the appellant, Hurt, in his printed argument calls attention to certain facts which he says cast a grave suspicion on the claim of Griffith that any theft of money from his home had been committed.

The testimony in behalf of the prosecution (State) fixes the time when the larceny was committed as between 8 o'clock and 10 o'clock on the evening of May 22, 1945, when none of the occupants of the dwelling in which the safe was situate were present. The regular occupants of the Griffith home were Mr. and Mrs. L. V Griffith, a then married

daughter, Mrs. Ruth South, a single daughter, Kate, who shortly thereafter married a young man by the name of Finley, and another small daughter—a child approximately three years old. For the purpose of this appeal it is conceded that an illicit relationship existed between the appellant, Wood, and Mrs. Griffith, the wife of L. V. Griffith, the prosecuting witness in this case.

The testimony adduced upon the trial was voluminous, and in presenting the State's case sequence was disregarded; and on this appeal we have not been furnished with a printed argument by the Solicitor or by counsel assisting the Solicitor in the prosecution.

As best we can gather from the record, on May 22, 1945, Wood and his wife and two children lived in Ware Shoals, but his gas station business was conducted about four miles from Ware Shoals and in the same general direction therefrom, if not on the same highway, that passed the home of Griffith; and in any event, it was more than two miles from the gas station of Wood to the residence of Griffith. Wood and his wife were on the friendliest of terms with the Griffith family, in fact, Wood and Mrs. Griffith were too friendly. The families frequently visited each other and especially was Wood at the home of Griffith very often, which situation had existed for a long while.

On the day of the theft, Wood was at the Griffith home from about 9 o'clock that morning until 3 o'clock in the afternoon, and ate dinner there. During this time, the entire Griffith family was at home, Mr. Griffith, however, being asleep, and in addition, two painters were there. During the morning, Hurt, accompanied by a woman of undisclosed identity, came to the Griffith home and asked to see Mr. Griffith, Mrs. Griffith would not disturb her husband who, as aforesaid, was asleep. The woman who had accompanied Hurt was invited into the house, but declined, whereupon Mrs. Griffith got in the car with her, and talked

for about thirty minutes, during which time, Hurt and Wood sat in Wood's car and talked. Hurt and his woman companion left, and the woman was not seen any more. Hurt denied having gone to the Griffith home until late in the afternoon of this day, and then only at the urgent request of Mrs. Griffith, and alone.

During the afternoon at about 6 o'clock, Mr. Griffith left home to go to Greenwood, and a short while thereafter, Mrs. Griffith and her daughter, Mrs. South, left there to go tell another daughter (presumably Kate) to come on home to supper. As they were returning from where they had gone to tell this other daughter to come home, and were passing the filling station run by Wood, they were flagged by Hurt. When they stopped, Hurt inquired as to the whereabouts of Mr. Griffith. Hurt was told that "he was not at home, that he had gone off." Hurt then talked with them for a few minutes, during which conversation he stated "that he needed money and that he was going to get money; he said he had a gun, and that he intended getting some money, that he had to have it." At the conclusion of this conversation, Mrs. Griffith and Mrs. South went on home, and were followed almost immediately by Hurt who then came into the Griffith home (presumably by invitation) and wanted to know when Mr. Griffith was expected to return, and was informed by Mrs. South that she didn't know, but thought he would be away all the evening. Hurt stayed at the Griffith home on this occasion for about fifteen minutes, and did not take with him when he left a zipper army bag, reference to which will hereafter be made. No mention is made of it if Wood was at his filling station when Mrs. Griffith and Mrs. South talked to Hurt there. After Hurt left the Griffith home on this occasion, Mrs. Griffith and Mrs. South went to the home of a neighbor for some milk, and upon reaching this neighbor's home found that she had gone to visit them at their home, so they immediately returned home. Upon returning, they found this neighbor,

and also noticed that a tire on their car was going flat. This neighbor stayed with them for about thirty minutes, and inside the home, and at the request of Mrs. South, after leaving delivered a message to some men to come fix the tire. Before the men arrived to fix the tire, Wood came to the Griffith home and was there when the men arrived to fix the tire, but Hurt was not there then, and apparently was not again seen at the Griffith home thereafter. Wood did not go in the house on this trip, but talked to Mrs. Griffith and Mrs. South outside and invited them to his home for supper, which invitation was accepted. Later when it developed that the tire had not been properly fixed, but was still leaking air, they drove to the filling station of Wood at which time he had turned off the lights preparatory to closing for the night, and informed him that they could not take supper with him and his wife. While they were there talking to Wood, an undesirable customer (being intoxicated) stopped at Wood's filling station, and in order to avoid him, Wood got into the automobile with Mrs. Griffith and Mrs. South, who drove off down the road as far as Jones' store, approximately one and one-half miles, turned around and came back to Wood's station where they parked and talked for a while longer. Upon leaving there, Mrs. Griffith and Mrs. South went home. During the absences of Mrs. Griffith and Mrs. South from the home as related above, no regular occupant of the home was therein except for a short while following their leaving to notify Wood that they could not eat supper with him. When they left on this occasion, the daughter, Kate, and Mr. Finley, whom she married a few weeks later, were still in the home, but soon drove away to Greenwood. While Mrs. Griffith and Mrs. South were at Wood's filling station, Kate and Finley passed returning from Greenwood, but as they stopped at the home of a friend betwixt Wood's station and the Griffith home, Mrs. Griffith and Mrs. South reached home ahead of them.

The theory of the prosecution is that the theft occurred while Mrs. Griffith and Mrs. South were at Wood's filling station, and in his presence, so it will be perceived that at the time the theft was committed, Wood was not even atmospherically present.

When Mrs. Griffith and Mrs. South returned home from Wood's station, they at first engaged in the hanging of some curtains, and later having occasion to go in the room which contained the wall safe, Mrs. Griffith discovered that the safe had been broken open and the money which had been therein, stolen.

All of the foregoing facts are taken from the testimony of the witnesses for the State, and it will readily be seen that contrary to proving the guilt of the appellant, Wood, this testimony establishes his innocence of the theft. And let it be kept in mind that the indictment did not charge either of the appellants with any crime other than burglary and larceny as principals; and the jury absolved both of the burglary charges.

Immediately following the discovery of the theft (between 10 o'clock and 11 o'clock), Mrs. Griffith, her daughter, Mrs. South and the Finley boy, who afterwards married Kate Griffith, went to the home of C. D. Strawhorn, a deputy sheriff of Greenwood County, residing at Ware Shoals, and informed him of the theft. Strawhorn thereupon investigated, and in consequence of his investigation, later went to Laurens where the appellant, Hurt, lived with his mother, and arrested him. For the present, however, we will pursue the testimony upon which the State depended to prove the guilt of Wood.

After notifying the deputy sheriff, and en route to Greenwood to tell her husband of the theft, Mrs. Griffith and the others accompanying her, stopped at the home of Wood and informed him of what had occurred.

Early on the morning following the theft of the night before, Mr. Griffith had to go to Laurens to procure a search

warrant for Hurt's house, and requiring gasoline for his car, procured same from Wood, who not only opened his filling station for the purpose of letting Mr. Griffith have gas, at about 6 o'clock, but went with him to Laurens. Griffith testified that following the theft, Wood came to his home practically every day; and that at some time within two weeks thereafter, when he returned home and found Wood there, Wood came out to his garage to meet him and said: "Cap, they have got me accused in this case and I will tell you what I will do, I will give you Eleven Thousand Two Hundred Dollars if you will drop my part of it." Griffith further testified that Wood made the same statement to him several times. The record is not entirely clear whether the transaction to which we are about to refer occurred prior or subsequent to the theft for which appellants were convicted, but Griffith on an occasion entrusted to Wood the sum of $2,500.00 with which to purchase a filling station for him, and when the deal didn't materialize, the money was refunded to Griffith. The implication is that this transaction occurred subsequent to the theft, and to the time Griffith claims Wood had offered him $11,200.00 to drop his part of the theft. Griffith did not procure a warrant for the arrest of Wood until after he learned of the intimacy existing, and which had existed for a long time, between his wife and Wood, and after his wife had absconded with more than $1,600.00 which he had entrusted to her following the theft. And not even then until he learned that Mrs. Griffith had first gone to Knoxville, Tenn., and while there and before leaving for some place in California, had notified Wood where he could come to see her, and that Wood had gone to see her in Knoxville. It is significant that at preliminary hearing for Hurt on June 23, 1945, Griffith, when testifying on that occasion made no mention of the offer of Wood to pay him $11,200.00 to drop any part that he (Wood) had in the theft, and again when a preliminary hearing was had for Wood on January 4, 1946, Griffith, though present, did not testify. And Griffith admits that

he brought this prosecution against Wood because he found out that Wood had been going with Mrs. Griffith.

Strawhorn, a deputy sheriff, testified that several days after the theft, he had orders to bring Wood to Greenwood for questioning, but at that time no warrant had been issued for him. When he was returning Wood to Ware Shoals, Wood said to him, "Mr. Charley, I am in a hell of a fix; what must I do to get out of it," and that he replied, "Tandy, I don't hardly know, but if I taken the money I would get it up and give it back, and if I didn't, I wouldn't." That Wood then replied, "Well, by God, I am going to get up my half of it and pay him back." This witness further testified that on another occasion, in the presence of Mrs. Wood, the appellant, Wood, stated to him: "Mr. Charley, I am going to raise that money. I'll mortgage or sell my house, and my car, and home and one thing and another and another little place I have, and pay Mr. Griffith his $11,-200.00," to which he replied, "Tandy, if I didn't get the money I would not sacrifice everything I had." On cross-examination this witness admitted that in this last conversation, when he made the statement just above quoted, Wood then said, "Mr. Charley, I am going to take your advice."

The fact that Wood had been too intimate with Mrs. Griffith appears to have been known to the officers of the law, and to practically every one except the husband, until after he had made a trip to Knoxville, Tenn., trying to locate her. That Wood was trying to prevent this knowledge from reaching Mr. Griffith is conceded; and that after Griffith learned of it, Wood greatly feared Griffith, especially when Griffith was drinking; and Wood was at the times of his conversation with Strawhorn keenly aware of the necessity of trying to keep Griffith from learning of his illicit relations with Mrs. Griffith, and later, with trying to appease him at any cost. C. H. Finley, who became the son-in-law of Griffith shortly after the theft, testified that Wood told

him he would mortgage his home and get $11,000.00 and pay Griffith to get the matter settled, but that the reason he (Finley) thought Wood made this offer was that he didn't want Griffith to learn that he (Wood) was going with Mrs. Griffith. Wood had, according to the testimony of Mrs. South, told her prior to the time Mrs. Griffith left Greenwood County, that he would give Mrs. Griffith $4,000.00 if she would leave.

The Sheriff of Greenwood County (Cal White) testifying in behalf of the State on the trial of this case, was asked by the Solicitor if he had a conversation with Wood about any money he was going to give Griffith, to which question Sheriff White replied: "Yes, Mr. Wood mentioned something to me about the money being given to Mr. Griffith. He said he had told Mr. Strawhorn that he was going to get up this money and pay it to Mr. Griffith, that is, his part of it or half of it, and he told me that Mr. Strawhorn said to him 'if I didn't get the money I would not pay it back',. and he told me that after Mr. Strawhorn told him that, that he dismissed it from his mind, so he didn't try to borrow the money."

The only other testimony appearing in the record which points the finger of suspicion in Wood's direction is that Hurt was seen driving into the driveway leading to the home of Wood during the day of May 22, 1945. It should be emphasized that although Wood had spoken of raising the sum of $11,200.00 and giving it to Griffith, he at no time admitted that he stole or received any portion of the $22,400-.00 stolen from Griffith. The nearest approach to such an admission, according to the testimony, was when deputy sheriff Strawhorn undertook to quote the identical words used by Wood, and as hereinbefore set forth. Again quoting these words: " * * * I am going to get up my half of it and pay him back."

It will not be disputed that the identical words used in repeating a statement which had been made long prior to the time when such statement is undertaken to be repeated, when depending upon memory alone, is next to impossible. The witness may be absolutely sincere, but when coupled with the fact that $11,200.00 was precisely one-half of the amount which had been stolen from Griffith, such witness could unconsciously and in good faith supply the word "my," and in so doing is merely testifying to the impression made upon his mind at the time, or after he had thought about the statement. Furthermore, at the time of this alleged statement by Wood about "my half of it," a warrant had not been issued for him, although he had been questioned. It was several weeks thereafter before a warrant was issued for him, and then only because Griffith had learned of the illicit relations which had existed between Mrs. Griffith and Wood.

It will therefore be observed that the testimony tending to connect Wood with the theft (we repeat that there was no count in the indictment charging him with conspiracy, accessory before or after the fact, or receiving stolen property) is for all practical purposes circumstantial. The law governing is stated in *State v. Kimbrell*, 191 S. C. 238, 242, 4 S. E. (2d) 121, 122, from which we quote:

"Where it is undertaken by the prosecution in a criminal case to prove the guilt of the accused by circumstantial evidence, not only must the circumstances be proven, but they must point conclusively—that is, to a moral certainty—to the guilt of the accused; they must be wholly and in every particular perfectly consistent with each other, and they must further be absolutely inconsistent with any other reasonable hypothesis than the guilt of the accused. *State v. Langford*, 74 S. C. 460, 55 S. E. 120; *State v. Aughtry*, 49 S. C. 285, 26 S. E. 619, 27 S. E. 199; *State v. Hudson*, 66 S. C. 394, 44 S. E. 968, 97 Am. St. Rep. 768."

"Every circumstance which is relied upon by respondent as material must be brought to the test of strict proof. All of the facts proved must be consistent with each other, and, taken together, should be of a conclusive nature and tendency, producing a reasonable and moral certainty that the appellant and no one else committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true, which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of appellant, then the proof fails. The reason for this is that all presumptions of law, independent of evidence, are in favor of innocence, and every person is presumed to be innocent until he is proved to be guilty. As has often been stated, it is not sufficient to establish a probability of guilt arising from the· doctrine of chances that the fact charged is likely to be true."

Applying this law to the testimony adduced upon the trial of this case, we must conclude that the trial Judge was in error in refusing the motion for a direction of a verdict of "Not Guilty" as to the appellant, Wood. In arriving at this conclusion, we have not given any consideration to the testimony of the witnesses for this appellant. The testimony for the State points conclusively to the fact that Wood was not and could not have been at or near the home of Griffith at the time the alleged theft was committed, so this fact alone is inconsistent with his guilt. The most that can be said of the testimony in this case is that, but for the evidence which established that Wood was not a principal, it would create a strong probability of his participation in the theft in some form. However, such is not sufficient on which to base a finding of guilty.

We now turn our attention to the testimony, additional to that hereinbefore set out, which tends to prove that the appellant, Hurt, committed the larceny. Hurt lived in Laurens, but was known by Mr. and Mrs. Griffith, Wood and

Mrs. South, the married daughter of the Griffiths. It does not appear that he had been in the vicinity of the Griffith home since before he commenced to serve a seventeen months sentence in the Federal Penitentiary for dealing in and selling counterfeit coupons for the sale of gas; and this theft is alleged to have occurred a short while after Hurt had been released from prison. Prior to serving this sentence, Hurt testified that he had sold a considerable quantity of gasoline stamps or coupons to Mr. Griffith and that Mrs. Griffith knew all about this. Mr. Griffith denied that he had ever purchased from Hurt any such gasoline coupons.

During the night of the alleged theft, and upon information of same coming to Griffith, who was at the time in Greenwood, he first returned to his home where he found deputy sheriff Strawhorn who had gone there to investigate the theft. After observing the situation at his home as to the condition of the safe, he noticed that some nightgowns belonging to his wife were scattered on a bed, and at least two were on the floor. He testified that these night clothes were usually kept "in a little old army bag." Accompanied by Strawhorn, and a Mr. Lyons and a Mr. Blanton, the latter identified as a speed cop, Griffith proceeded to Laurens. They there got in communication with Sheriff Weir (probably the Sheriff of Laurens County) and all of them proceeded to the home of Hurt. While making a search there they found a zipper bag in the foot of Hurt's automobile. This bag was practically identified as the one in the Griffith home in which Mrs. Griffith usually kept her nightgowns; and Hurt admits that it was a bag given to him late in the afternoon of May 22, 1945, by Mrs. Griffith, his explanation of his possession of same being as follows: That late that afternoon of the night of the alleged theft he had gone to Wood's filling station to see him; that Wood was not there, but a man by the name of John White was in charge of the station; that while there Mrs. Griffith and Mrs. South passed by in an automobile, but very soon turned

around and came back to the filling station and called him to their car; that Mrs. Griffith wanted him to deal in gas stamps again, and although he told her he would not do so, upon her insistence he followed her to her home and she gave him this little zipper bag in which to bring the stamps if he should change his mind and decide to again deal in gas stamps. This version or explanation of why Hurt was in the possession of this bag, be it a zipper bag or an army bag, was corroborated by John White, referred to above, who further testified that Mrs. Griffith came to his home between 3 o'clock and 5 o'clock on the morning of May 23, 1945 (the same night of the alleged theft), to tell him not to say anything about the handbag that she told the man to come over to her house and get, and warned him that if he did, her husband would kill him. The testimony of John White as to Mrs. Griffith coming to their home during the night of the theft and asking him not to mention anything about the handbag was corroborated by Mrs. White and Mrs. Nellie Tutton, who was on that night staying in the same home with the Whites.

Hurt was arrested and placed in jail on the same night of the robbery, where he remained for several days, if not weeks, before he arranged bond for his appearance at Court. He at all times denied to the officers of the law that he had any part in the alleged theft. On the morning following Hurt's arrest, the home in which he was living was thoroughly searched, but no money was found, nor has it ever been recovered.

The most damaging testimony against Hurt was given by Mr. and Mrs. H. R. Childs, the brother-in-law and sister, respectively, of Wood, and by Wood. Childs, who had formerly been connected with Hurt in the sale of illegal gasoline ration stamps, testified that Hurt told him in Laurens that he was the one who had stolen Griffith's money from his safe, and that it didn't take him but about fifteen minutes to get to the money. This statement is alleged to

have been made in the presence of Mrs. Childs, who corroborated the testimony of her husband—in the main only. Wood testified that Hurt told him at his (Hurt's) home, after he had been released on bail, that he had the Griffith money, which statement was made in the presence of Mrs. Griffith, and that if they would come back to his home that night between 12 o'clock and 3 o'clock, he would give this money back; that he and Mrs. Griffith went back and stayed around practically all night, but no money was returned to them.

We have made a careful study and analysis of the testimony tending to establish the guilt of this appellant, and while we are not at all impressed with this evidence, yet by season of the direct admissions and statements made by Hurt, if any credence be placed in the testimony of Mr. and Mrs. H. R. Childs, and of Wood, the verdict of the jury can be justified. The writer is strongly of the opinion, however, that Hurt's former criminal record was the influencing factor which resulted in his conviction.

We have not herein set out in as much detail the testimony relied upon by the State relating to Hurt as we did in discussing the testimony relating to Wood, such being unnecessary since there is no appeal from the refusal of the trial Judge to grant this appellant's motion for a direction of verdict of "Not Guilty," but have detailed sufficient to show that the testimony tending to connect Hurt with the theft required that as to him, the case be submitted to the jury.

The learned trial Judge, who saw the witnesses, heard their testimony, and was in a better position to appraise the evidence falling from their lips, has in his discretion, refused to exercise the power vested solely in him of granting a new trial on the facts. On appeal from the refusal of a Circuit Judge to grant a new trial on questions of fact, no relief can be afforded here. *State v. Cardoza,* 11 S. C. 195; *State v. Clark,* 15 S. C. 403, 407; *State v.*

*Tarrant,* 24 S. C. 593; *State v. Haines,* 36 S. C. 504, 15 S. E. 555; *State v. Hayes,* 69 S. C. 295, 48 S. E. 251. Of course, if there was no testimony to support the verdict, this Court would not be powerless.

Appellant's last exception raises the issue that the sentence imposed was an excessive and severe penalty in violation of the Constitution of the State of South Carolina. (Appellant undoubtedly has reference to Article 1, Section 19.)

There is no statute specifically prescribing the punishment for grand larceny, but section 1034 of the Code of 1942, provides that where no special punishment is provided for a felony, it shall, at the discretion of the Court, be "for a period not less than three months nor more than ten years." And Section 1038 of the Code reads: "In cases of legal conviction, where no punishment is provided by statute, the court shall award such sentence as is conformable to the common usage and practice in this State, according to the nature of the offense, and not repugnant to the Constitution."

The issue now under discussion has recently been before this Court, notably in *State v. Kimbrough,* S. C., 46 S. E. (2d) 273, 275. Mr. Justice Oxner, in writing the opinion of the Court in that case, stated: "The weight of authority is to the effect that if the statute fixing the punishment for an offense is not unconstitutional, a sentence within the limits prescribed by such statute will not be regarded as cruel and unusual. 15 Am. Jur., page 174. It was held in *State v. Davis,* 88 S. C. 229, 70 S. E. 811, 34 L. R. A., N. S., 295, that this Court has no jurisdiction to correct a sentence on the ground that it is excessive when it is within the limits prescribed by law for the discretion of the trial Judge and is not the result of partiality, prejudice, oppression or corrupt motive. The rule there adopted has since been approved and followed in numerous cases. *State v. Bowman,* 137 S. C. 364, 135 S. E. 360; *State v. Johnson et al.,* 159 S. C. 165, 156 S. E. 353; *State v. Crosby,* 160

S. C. 301, 158 S. E. 685; *State v. Bolin,* 209 S. C. 108, 39 S. E. (2d) 197; *State v. Brandon,* 210 S. C. 495, 43 S. E. (2d) 449."

Holding that under the circumstances of that case, and the statute under which the defendant was being sentenced, and the jury having recommended mercy, that the sentence was too severe, the case was remanded for the purpose of re-sentencing the defendant. However, in remanding the case for the purpose aforestated, it was stressed "that only under rare and unusual circumstances will this Court interfere with the discretion of the trial judge in the imposition of a sentence."

In the instant case, the sentence was within the limit fixed by the statute (Section 1034 of the Code). The amount was considerable, and was stolen from a residence, after breaking into a small wall safe; and there is evidence that at the time of the commission of the crime, the appellant was armed. If the trial Judge was of opinion that the jury properly found the appellant guilty, we cannot hold that the sentence imposed was so severe as to require this Court to remand the case for a re-sentence of the appellant. Any relief which the appellant obtains must necessarily come from some source other than the Judicial branch of the Government.

Reversed as to the appellant, Wood.

Affirmed as to the appellant, Hurt.

FISHBURNE, STUKES, TAYLOR, and OXNER, JJ., concur.