## 16169

### STATE v. MANIS
(51 S. E. (2d) 370)

*Messrs. Thomas W. Whiteside, C. Y. Brown and Sam N. Burts,* all of Spartanburg, *for appellant,*

*Mr. Samuel R. Watt,* Solicitor, of Spartanburg, *for Respondent.*

January 12, 1949.

BAKER, Chief Justice:

On the night of February 26, 1948, the mill office of the Glendale Company at Glendale in Spartanburg County (also known as Glendale Mills), was entered through a window, the large safe therein broken open, and approximately $20,-000 stolen therefrom. Almost immediately thereafter and, so far as the record discloses, with nothing on which to base the suspicion other than the fact that it was known that the appellant had on more than one occasion served time for "safe cracking," and about eighteen years prior thereto had resided in Sapartanburg County, the officers of the law, particularly the Sheriff of Spartanburg County, commenced to look for the appellant. Thereafter, and prior to the arrest of the appellant on April 4, 1948, at his home in Wolf Valley, Anderson County, Tennessee, on a "fugitive from justice warrant," a photograph or picture of the appellant had been indentified, so it was testified, by T. M. Howe and his wife, Mrs. Annie Howe, employees of Glendale Mills, as the man they had seen sitting in an automobile parked near the office of said mill, at about 10:20 o'clock on the night the crime was committed. We cannot ascertain from the record whether at that time a reward of $500 or more had been offered for the apprehension and conviction of the party guilty of this "safe cracking," and in fact there is no positive and direct testimony that such a reward was ever offered, although it is apparently not denied that such a reward was outstanding. We will hereinafter again refer to the testimony of the Howes.

For a conviction in this case, respondent relied wholly upon circumstantial evidence. The measuring stick in such instance is set forth in *State v. Kimbrell,* 191 S. C. 238, 4 S. E. (2d) 121, and followed and applied in *State v. Dornberg,* 192 S. C. 513, 7 S. E. (2d) 467; *State v. Edwards,* 194 S. C. 410, 10 S. E. (2d) 587; *State v. Powell,* 202 S. C. 432, 25 S. E. (2d) 479; *State v. Takis,* 204 S. C. 140, 28 S. E. (2d) 679, and other cases; and is as follows [191 S. C. 238, 4 S. E. (2d) 122] :

"Where it is undertaken by the prosecution in a criminal case to prove the guilt of the accused by circumstantial evidence, not only must the circumstances be proven, but they must point conclusively—that is, to a moral certainty—to the guilt of the accused; they must be wholly and in every particular perfectly consistent with each other, and they must further be absolutely inconsistent with any other reasonable hypothesis than the guilt of the accused. (Citing authorities.)

"Every circumstance which is relied upon by respondent as material must be brought to the test of strict proof. All of the facts proved must be consistent with each other, and, taken together, should be of a conclusive nature and tendency, producing a reasonable and moral certainty that the appellant and no one else committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true, which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of appellant, then the proof fails. The reason for this is that all presumptions of law, independent of evidence, are in favor of innocence, and every person is presumed to be innocent until he is proved to be guilty. As has often been stated, it is not sufficient to establish a probability of guilt arising from the doctrine of chances that the fact charged is likely to be true."

At the conclusion of the testimony on behalf of respondent, the appellant moved for a direction of a verdict of not

guilty, which motion was refused. Whereupon, the appellant offered no testimony. Indeed, he could have only entered a denial—not even a corroborated alibi—since the members of his household were not at home on the date the crime was committed, nor immediately before or after such date. The appellant's home was in a mountainous section of Tennessee, and we are not informed if the appellant had any near neighbors.

The indictment contained three counts, (1) Housebreaking and entering with intent to steal, (2) Grand larceny, and (3) Receiving stolen goods at the time knowing same to be stolen. The Court of its own motion directed a verdict of not guilty as to the third count, but as aforesaid, refused the motion for a direction of verdict of not guilty generally. The jury convicted the appellant on the remaining two counts, and after refusing a motion for a new trial, the trial Judge sentenced the appellant the limit on each count, that is, five and ten years, respectively, or a total of fifteen years, on the public works of Spartanburg County or for a like period in the State penitentiary.

The appellant's exceptions are:

"1. That His Honor, the Presiding Judge, erred in refusing defendant's motion for a directed verdict of not guilty (and motion for a new trial based thereon) at the close of the State's testimony, the error being that the evidence was entirely circumstantial and did not meet the requirements of the law as to a conviction upon circumstantial evidence in that it did not point so conclusively to the defendant's guilt as to preclude any other reasonable hypothesis and beyond a reasonable doubt, and did not point to his guilt to a moral certainty.

"2. That His Honor, the Presiding Judge, erred in admitting into evidence the entire first three paragraphs of a statement made by Virgil G. Manis, the error being that the said testimony as contained in the statement of Virgil G.

Manis related entirely to facts occurring before the offense charged, were in no way connected with the offense charged, and was highly prejudicial in that it placed the defendant's character in issue by tending to show that he had committed other offenses of a similar nature."

These exceptions require us to summarize and discuss the testimony.

With absolutely nothing on which to base his suspicion, immediately upon learning that the mill office and safe of Glendale Mills had been broken open and approximately $20,-000.00 stolen therefrom, the Sheriff of Spartanburg County commenced to look for the appellant, calling to his aid all available law enforcement agencies, state and federal, although the appellant, so far as the Sheriff had any information at that time, had not been in Spartanburg County for eighteen years.

There came to his aid two most remarkable witnesses, T. M. Howe and his wife, Mrs. Annie Howe, who were able to recognize, first a photograph or picture of the appellant, and later the appellant when he was brought before them, as a man they had seen sitting in an automobile parked near the mill office at about 10 o'clock or shortly thereafter, on the night the crime was committed. The record does not disclose when a reward for the apprehension and conviction of the guilty party was publicized. But crediting Mr. and Mrs. Howe with all sincerity, their ability to keep in mind the features of one whom they had never before seen by not much more than a fleeting glance as they were passing an automobile in the nighttime, although within two or three feet of the automobile, especially when such one was wearing a hat pulled down over his face to an extent, and with no particular distinguishing marks or features, to say the least, is most dubious. Mr. and Mrs. Howe were employees of Glendale Mills, and came to the mill to get excused from going to work on the 10 o'clock p. m. shift for the reason

that they had two sick children. After being excused, they stood in the door of a nearby building and talked to the night watchman at the mill and noticed a car, with a man in it, parked in a place adjacent to the mill office where it was not usual for cars to park, and which they say aroused their suspicion, but not to the extent of calling to the watchman's attention the parked car. In going from this building to the bus stop in order to board a bus for their home, they passed close to the parked car and this was when they saw more clearly a man sitting under the steering wheel of the automobile—the one they later identified as the appellant. There was a light nearby, and Mrs. Howe at one place in her testimony said there was a light on in the automobile. (She later testified that there was no light on in the car.) Evidently she intended to convey the impression that the nearby light from the street, or a light which she said was on in the office (in this latter statement, the testimony conclusively shows that she was mistaken) was shining into the car. If the man sitting in the parked car had a light on in the car, we can dismiss the idea that this man was there waiting for an unlawful purpose. The man in this car had on a gray hat, partially pulled down over his face. There was nothing peculiar about this hat (it being a man's hat). But, these two witnesses say that they became even more suspicious of "the man in the car" because they could tell in the nighttime that he was watching them, and yet they made no report to any one of such incident or of their suspicions until several days thereafter, and presumably after a reward had been offered. In his testimony Mr. Howe protested repeatedly, and even when unnecessary that the reward had not entered into his identification of the appellant as the occupant of the parked automobile. We are not informed of the circumstances under which these two witnesses recognized the picture of the appellant when it was exhibited to them along with pictures of other men, but after the appellant was arrested and brought to the Spartanburg County jail, they knew that he was going to be brought before them, and he alone was

brought, at which time they identified him—all from the more or less fleeting glance they had of him sitting in an automobile in the nighttime with his hat pulled low on his face, and after they had become familiar with his face from a picture of him in the possession of the Sheriff. Mrs. Howe identified the car which she saw parked near the mill office as a "black and dirty-looking—looked like a Ford V-8." The automobile owned at that time by the appellant was a "1947 Oldsmobile business coupe." However, a man would not necessarily drive his own car on such a mission.

The testimony of the two witnesses discussed above is the strongest link in the chain of circumstantial evidence connecting the appellant with his crime. And this evidence purports to have him sitting in a car where he would be seen by the night watchman or night policeman, waiting to commit a felony, at a time when the mill was changing shifts for the night, and necessarily numbers of people passing with this parked car in their view, if the light shone thereon from the street.

The Sheriff of Spartanburg County mailed posters or circulars carrying the picture of the appellant and that he was wanted in Spartanburg. On this information, a "fugitive from justice" warrant was procured by some Tennessee officers who went to the home of the appellant and there arrested him. At the time the appellant was arrested he inquired as to what he was charged with, and the officers thereupon showed him the circular. He then and there stated, "Well, they don't have a * * * thing on me." On the way to prison, it is testified that the appellant said: "I know what they want with me. I used to work at the mill in Spartanburg, eighteen (18) years ago. I read where the safe had been cracked and robbed at Glendale Mill. I did not have anything to do with it. I was not even down there."

We place no significance on this statement. The robbery of this safe involving so much money was no doubt widely

publicized. In reading newspapers the appellant's attention to this news item was probably emphasized for two reasons: first, he had at one time lived in Spartanburg County, and second, he had served two sentences (terms in prison) for "safe cracking." It was but a natural suspicion on his part that the officers of the law were trying to connect him with this "safe cracking," especially in the light of the circular which the arresting officers had permitted him to read.

On the day the appellant was arrested nothing was found on the premises that even remotely connected the appellant with this crime. After the arresting officers carried the appellant to a jail in Kingsport, Tennessee, the Sheriff of Spartanburg County was notified of his arrest, and accompanied by some state officer, went to Kingsport, and along with three postal inspectors, questioned the appellant, but received nothing other than denials of any connection with the crime. On the following day several officers returned to the home of the appellant, and on that occasion the son of appellant, Virgil G. Manis, showed the officers where he had buried some money up on a hill about a hundred yards from the residence. The money was tied up in some cloth. Appellant's said son dug up the money, which was counted and there was found to be approximately $51.00 in dimes and nickels. There was found in and around the appellant's home two metal boxes. In his car some tools were found, some punches, a pinch-bar or crow-bar, a pair of pliers and a screw-driver or two. None of these tools bore any evidence of ever having been used. One of the metal boxes above referred to was in the appellant's automobile, and contained some quarters and pennies and when this money was poured from the metal box, there were some cylinder shaped pieces of paper in the money. (On cross-examination, the witness who testified as to this money found in the car in one of the metal boxes, changed his testimony and said it was in a cigar box.) Also found in appellant's car was a pair of cloth gloves. There is some evidence of other money in the possession of

members of appellant's family totaling $472.50 as we read the record, but appellant's counsel state that the money from every source "was some $600.00," and we assume that this included the $51.00 buried, and the money found in the automobile of the appellant.

A great many people have a penchant for saving nickels and dimes and while $51.00 in such coin is considerable, yet it is no evidence of the fact sought to be proven that the appellant committed the larceny with which he is charged. And certainly because his son buried these coins without any such instruction from the appellant, and then pointed out to the officers where he had buried them, cannot be taken as evidence against the appellant. It may well be that the appellant intended at some time to take these nickels and dimes to a bank and get them placed in rolls of $2.00 as other rolls he had owned. Nor are the tools found in the appellant's automobile any evidence that he committed the crime of which he was convicted. While some of them could, and probably would be used in breaking open a safe, if a safe was to be opened in such manner, yet these tools showed no evidence of usage and are not unusual tools to have on a farm. This portion of the evidence tends to negative the guilt of the appellant. Again the possession of cloth gloves on a farm is almost necessary. Indeed, any outdoor work in the winter time requires the wearing of gloves, usually of cloth, if one's hands are to have any protection.

The only portion of this link in the chain of evidence which has any significance is the testimony that in this loose money, there were some cylinder shaped pieces of paper similar to those made from punching or cutting out bills and other like papers for filing on old style boards, which will be found in a great number of offices. The Glendale Mills had such a punching machine which was not peculiar to it. Some of the money stolen from Glendale Mills was evidently carried away in a metal waste basket in its office, but the metal waste basket had been emptied of its contents

on the floor of the office and there is no evidence in the record that in this waste paper there were any of these cylinder pieces of paper. It is pure conjecture that any of these cylinder shaped pieces of paper were in this waste paper basket. And again, if the payroll of the mill was in envelopes ready to be distributed to the employees, or in rolls, the actual coins would never have come in contact with the cylinder shaped pieces of paper had there been any in the basket.

There was testimony that the appellant had been in the possession of nickels rolled in paper, $2.00 to the roll, but no evidence to identify any of these rolls as coming from Glendale Mills. The rolls of nickels in the possession or which had been in the possession of the appellant were wrapped in the regular wrappings used by banks with no identification marks on same, whereas all of such money made into rolls by Glendale Mill had the name "Glendale Mill" stamped on them. No such rolls were ever seen in the possession of the appellant.

When the officers returned from the second trip to the home of the appellant (the occasion on which they "found" the buried money and the tools in his car, reference to which has been made), they again talked to the appellant and he continued to maintain that he was innocent. During this conversation an officer who held the office of constable in Tennessee undertook to quote verbatim a "casual conversation" between himself and the appellant, and we here quote from the record. "I said: 'Your daughter-in-law said she saw them hundred-dollar bills in a metal foot-locker. He said they was not in that locker; whoever heard of a cotton-mill man making a hundred dollars?' He said: 'That is a damn lie, were not any hundred-dollar bills in that job, whoever heard of a cotton-mill worker making a hundred dollars?' Talked with him on another occasion, sitting in front of the jail. He said it would take him about three minutes to get in a safe. Said: 'I just punch them out.' I said 'It looks like it would make a lot of noise.' He said if there

was a store-building, and you had your office upstairs, I could crack your safe and get your money, and you would never know I had been there until you got down and seen it was gone.' He said he worked by himself."

We see nothing in this conversation, if correctly quoted, and we had occasion to remark on the impossibility of a witness repeating the identical words used in a conversation, in the recent case of *State v. Hurt et al.,* 212 S. C. 461, 474, 48 S. E. (2d) 313, which in anywise connects the appellant with the felony of which he was convicted. The appellant stated nothing more than is known generally that cotton-mill employees are not paid off in $100.00 bills. And while he may have been bragging insofar as his ability to enter the average safe, yet it is common knowledge that an experienced safe cracker can do just what the appellant said he could do. Let it be kept in mind that the appellant consistently denied any connection with the "safe cracking" of Glendale Mills.

If it be conceded that the written statement signed by the appellant's son and admitted by the appellant to be true, with one exception, and we assume that the exception was to the $472.50 referred to therein as "hot money," and the "hot money" portion was excluded, was admissible in evidence, there is yet nothing therein which connects the appellant with the Glendale Mills safe cracking. It is evidence, however, that long prior to the "safe cracking" for which the appellant was convicted, he had money, both paper and coins, the latter of which had been placed in rolls, and that he was liberal with his son, especially when his apparent station in life is considered.

Can it be said in the present case that the circumstances relied upon to connect this appellant with the crime charged in the indictment meet the requirements where the State relies solely on circumstantial evidence? We think not. The most that the testimony in this case does is to cast suspicion on the appellant, but it is far from sufficient to "point con-

clusively—that is, to a moral certainty—to the guilt of the accused; * * * and * * * be absolutely inconsistent with any other reasonable hypothesis than the guilt of the accused."

Because of the insufficient and unsatisfactory character of the evidence relied upon by the State to prove that this appellant committed the crimes charged in the indictment, and of which he was convicted, the evidence when analyzed, was insufficient to warrant the trial Judge in submitting the case to the jury.

There is no conflict in the testimony, that is, as between that offered in behalf of the respondent and the appellant, because the latter offered no testimony. It is for a lack of testimony on the part of the State that we base our conclusion.

Copy-modeling from the dissenting opinion of Acting Associate Justice, G. Duncan Bellinger, in *State v. Baker,* 208 S. C. 195, 37 S. E. (2d) 525, the maxim of the law is that it is better that many guilty should escape than that one innocent should suffer, and while we are not expressing the opinion that the appellant is innocent, we think it consistent with the rules by which this Court is governed in like cases that the appellant should have had the benefit of the doubt.

The judgment of the lower Court is reversed and the case remanded for entry of judgment for the appellant; and unless there are other charges pending against him, it is ordered that he be discharged from custody.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.