16268

STATE v. HACKETT

(55 S. E. (2d) 696)

Messrs. *Howard L. Burns, Charles A. Young* and *J. W. Bradford, Jr.,* all of *Greenwood, for Appellant,*

Mr. *Hugh Beasley, Solicitor,* of Greenwood, *for Respondent,*

October 15, 1949.

FISHBURNE, Justice.

The appellant, Wade Hackett, was found guilty in the Court of General Sessions for Greenwood County of the murder of J. W. Hunt. The jury recommended to mercy, and he was sentenced to life imprisonment in the state penitentiary.

At the conclusion of testimony offered by the State, and upon the close of all the testimony, appellant moved for a directed verdict of not guilty. After the rendition of the verdict, a motion was made for judgment *non obstante veredicto,* and in the alternative for a new trial. All of these motions were refused.

In order to prove the guilt of appellant, the State relied wholly upon circumstantial evidence, and the sole question raised by this appeal is whether the evidence adduced at the trial meets the requirements of law as to the sufficiency of circumstantial evidence necessary for conviction.

J. W. Hunt, a country merchant sixty-one years of age, who operated a store located about three miles south of Greenwood in a sparsely settled community, was shot on the evening of January 17, 1948, and died almost immediately, without regaining consciousness. There were no eye witnesses and the evidence fixed the time of the killing at sometime between 7:00 and 7:30 o'clock p. m. His body was discovered, as the evidence shows, very soon after he was shot. No one heard the report of the pistol, nor did anyone see the murderer enter or leave the store.

The body of the deceased when discovered was lying on the floor at the rear of the store between the end of the counter and the stove. It may be inferred that the person who killed him entered the store as a pretensive customer and asked for six cans of Carnation milk, for in a paper bag on the counter were six cans of milk of this brand. It was shown that six cans of this milk were priced at 45 cents, and this amount had been rung up on the cash register near the end of the counter. A $5 bill, evidently ten-

dered by the person who shot Mr. Hunt, and 55 cents in change were lying on the cash register slab. Three $1 bills lay on the floor beside the body near the right hand, and another $1 bill was found beneath the body. An empty 32-calibre pistol shell of a type fired from an automatic pistol was found in a corner back of the stove. Another empty shell of the same type was discovered about thirty days later behind the counter, and both were turned over to the sheriff. There was evidence of only one bullet wound in the body of Mr. Hunt, and after a thorough search a second bullet was never found in the store. Mr. Hunt's death was caused by a 32-calibre copper jacketed bullet fired from a Colt automatic 32-calibre pistol, which entered under the collarbone on the left side about midway, and penetrated diagonally downward and to the right through the heart and the right lung, and was taken from the body about the fourth rib space at the right of the backbone. As stated, this bullet was turned over to the sheriff who market it for identification.

The body of the deceased was discovered by two young women customers who said that when they approached the store, which was around closing time—probably between 7:00 and 7:15 o'clock p. m.—the light under the shelter on the outside of the store had been turned out; the front door was closed, but was unlocked and they pushed it open. One light was burning in the rear of the store above the cash register. At first they saw no one and called Mr. Hunt; they thought they heard a long drawn breath, and looking down saw Mr. Hunt's body outstretched on the floor at the end of the counter. They immediately gave the alarm, neighbors arrived upon the scene, and a call was put in to the sheriff's office at Greenwood, three miles away. The sheriff stated that this call was received at headquarters at 7:30 p. m.

At 7:00 o'clock on the night of January 17th it was dark. The weather was foggy and rainy, and if there were any

tracks of feet or automobile tires they were soon obliterated by the officers and others arriving upon the scene. Upon search being made, no substantial amount of money was found in the cash register. It appears that Mr. Hunt had been known to carry on his person three or four hundred dollars, but there is no testimony that he had any large amount of money on him the night of the murder. However, it can reasonably be inferred that robbery was the motive of the crime because the hip pockets of the deceased had been pulled inside out.

Mr. Hunt's store was located on United States Highway No. 25, a much traveled thoroughfare between Grenwood and Augusta. The appellant, Hackett, lived on what is designated as the Mount Moriah Road which branches off from U. S. Highway No. 25 about one mile from the Hunt store. Hackett, a Negro thirty-four years of age, lived on a farm about seven miles down this road, and although he had been living in this community practically all of his life, he testified upon the trial that he did not know Mr. Hunt, had never heard of him, and had never been in his store.

On February 28, 1948, about six weeks after the murder, Hackett carried his 32-calibre Colt automatic pistol to a local pawnshop in Greenwood and pawned it. He had originally purchased this pistol from the same pawnship about ten months prior to the murder. The pistol was turned over to the sheriff of Greenwood County the same day it was pawned. As a result of comparison tests made by ballistics experts with the Law Enforcement Division of the State and Federal Bureau of Investigation, the sheriff had reason to believe that the bullet taken from the body of Hunt had been fired from appellant's 32-calibre Colt automatic pistol.

Wade Hackett was taken into custody on March 5, 1948, and was indicted and arraigned for the murder of Hunt at the June (1948) term of the Court of General Sessions, at which time the three able counsel now representing him were

appointed by the court. He was later tried at the September (1948) term.

Appellant, who had a wife and six children living with him—three of whom were children of his wife by a former marriage—had been without employment but had obtained work with the Greenwood Packing Plant on January 16, 1948, the day before Hunt was killed. When he was taken into custody on March 5th and was told by the sheriff and the arresting officers that the bullet which killed Hunt had been fired from his pistol, he asked to see the pistol. It was at once shown to him and he admitted that the pistol was his, and at the same time according to the officers, he glanced over his shoulder at Deputy Sheriff Buzhardt, and said that he would not have admitted that he owned the pistol if Mr. Buzhardt had not seen it in his car before, and knew that it belonged to him.

. When the pistol was pawned by appellant on February 28, 1948, he was told by Mr. Gunnells, the pawnshop keeper, that the Greenwood police inspected pawnshops in Greenwood every Monday morning to check on stolen articles. Appellant made no objection, doubtless knowing that he had not stolen the pistol. He secured a loan of $12. .Upon trial he repeated what he told the officers with reference to the pistol, and stated time and again that the pistol had never been out of his possession until it was pawned. He said that he always carried this pistol in the pocket of his automobile on week ends for his protection, because it was on week ends that one might expect trouble and run into difficulties. That when he would return home he would invariably take the pistol from the pocket of his car and place it under the mattress of his wife's bed, where it stayed until he would move it and put it in his automobile pocket again when leaving home in the car. He stated that he never forgot and left it in his car upon returning home, and always followed the procedure outlined. He also said that he knew that no one had had his pistol.

Appellant attempted to establish an alibi. He said that his mother and father lived about 200 yards from him on the Mount Moriah Road. His mother would go to Greenwood on Saturdays to make her weekly purchases at the grocery store of Mr. White, and that at her request he promised to go to this store and get the supplies purchased by her on this particular Saturday of January 17, 1948. He left his home about 6 o'clock p. m. in his car, drove to Greenwood, obtained his mother's groceries, and proceeded out of Greenwood on Route 25. When he reached a point on this highway about one mile from Hunt's store, he turned to the right on the Mount Moriah Road and drove directly to his mother's home, reaching there about 7 o'clock.

According to the mother's testimony, atfer making her purchases at the White grocery store, she went to the bus station in Greenwood, from which a bus was due to leave at 6:30 p. m. She boarded this bus, and from her testimony and that of the bus driver, it may be inferred that this being Saturday night, the bus did not leave Greenwood until about 6:45 o'clock p. m. When it left, well loaded with passengers, it proceeded along the usual route out of Greenwood along Route 25 and turned out on the Mount Moriah Road on which she and her husband lived. Their home was located about seven miles from Greenwood, and the bus driver said it usually took him about thirty minutes to make the trip to this point, but on Saturday nights it took a little longer for his passengers to get off with their bundles at the various places where they lived. From the Hackett (parents of appellant) home the bus would proceed about two miles farther on, to Whitehall, turn around and go back to Greenwood by the same route.

Appellant, as shown by his own testimony and that of his mother, did not reach his parents' home until about five minutes after she got off the bus and reached her home, which would reasonably place this time at 7:30 o'clock p. m.

or later. He says that he gave his mother the groceries and went directly to his own home about a hundred yards away.

The theory of the State is that upon leaving Greenwood in his automobile, appellant drove on U. S. Highway No. 25 through the South Greenwood Textile Community, passed the intersection of Highway No. 25 and the Mount Moriah Road and continued on for a mile to the store of the deceased where he killed him for the purpose of robbery. That leaving the store he got into his car, drove on Highway No. 25 about a half mile to Flemings Cross Road, where he turned to his right on a paved road connecting with the Mount Moriah Road, and then proceeded to his mother's home to deliver her groceries. The distance from the city limits along this alternate route by the store of the deceased to the home of appellant is only one mile farther than the shorter route by the Mount Moriah Road which branched off from Route No. 25 above the Hunt store.

According to the testimony of appellant and his wife, when he reached his home on the night of January 17th, the bus upon which his mother had traveled had gone the two or three miles below her home, had turned around, repassed her home, and proceeded back to Greenwood along the Mount Moriah Road. However, appellant says that he never met or saw this bus.

His stepson, Clarence, was not at appellant's home when he returned, having boarded this same bus as a passenger. We mention this because the suggestion is made in appellant's brief, in an effort to show that someone else other than appellant might have killed Mr. Hunt; that Clarence might have obtained appellant's pistol and committed the murder. This reasoning, however, carries no conviction because Clarence left appellant's home before appellant ever reached there. In this connection it should be stated that although appellant testified that he invariably carried his pistol with him in the car on Saturdays, he said he did not do so on this particular Saturday night. He stated that he had not

taken the pistol from beneath his wife's mattress for a week preceding the murder, but on the morning following Mr. Hunt's death,—that is, on January 18th,—he checked to see if the pistol was under the mattress, and there he found it.

Appellant's wife testified that they always gave their baby Carnation milk. In his testimony, appellant said that the baby was given various brands of milk. His wife stated that on the night of January 17th when appellant returned home, he went to bed without eating supper because he had a bad cold. Witnesses who were with him the following morning stated that they saw no evidence of cold.

If appellant killed Mr. Hunt and the motive was robbery, there is no evidence that he was ever in possession of the fruits of his crime. On the contrary, following the night of the killing and prior to his arrest, he bought groceries on credit and pawned his pistol to make an installment payment on his automobile; and he consistently denied any connection with the crime from the date of his arrest. His previous criminal record consisted of a conviction for housebreaking and grand larceny in 1941.

The jury could reasonably have inferred that Mr. Hunt had no money in his pockets at the time of his death. He had been cautioned by his brother-in-law to stop the practice of carrying money on his person some weeks before his death. It can reasonably be inferred that Mr. Hunt's murderer must have had reason to believe that he had little time to reap the fruits of his crime, because the $5 bill, the 55 cents in coin, and the four $1 bills were untouched. Evidently he left the scene of the crime in haste.

Appellant gave certain testimony in an effort to prove that he had some general knowledge of the science of ballistics. This testimony was given, we take it, in order to show that with this knowledge, if guilty, he would not have been likely to leave his automatic pistol in the pawnshop after having been told that the Greenwood police checked pawnshops every Monday for the purpose of discovering stolen goods.

The inference is that if he had known that his pistol had been used to kill Mr. Hunt, he would not have run the risk of having a ballistics expert examine it, together with the bullet taken from Mr. Hunt's body and the discharged shells found in the store. Appellant stated that he could not read or write, but that he had been to some moving picture shows and there had learned that you could take "directions of bullets, where they can take a record of how a bullet goes, where a man stands and they shoot a bullet and they show how fast it goes and all that; I've seen all of that in picture shows." We think it would not be difficult for the trial jury to have concluded from this testimony that appellant had a very scant knowledge of ballistics, or that he knew that a bullet fired from a particular pistol could undergo ballistics tests and it could be determined that the bullet was fired from that pistol.

Officer Patterson testified to a conversation he overheard between appellant and his wife while appellant was in the penitentiary awaiting his trial. This witness quoted appellant as saying: "I know they made a record of what I said the other day; they wasn't foolin' me none." And this with reference to the pistol: "You can't tell one pistol from another; you can't make me believe that."

Appellant, after his arrest, made several contradictory statements to the officers as to where he purchased cartridges for his 32-calibre Colt automatic pistol. It was not disputed that five cartridges found by the officers in appellant's automobile were of the same type and make as those used in the pistol which killed Mr. Hunt.

It appears that appellant is left-handed, and much is said in appellant's brief concerning the position of Mr. Hunt and the person who killed him as indicated by the course of the bullet. It would not be difficult for the jury reasonably to infer from the position in which the body was found and the course of the bullet through his body, that a left-handed man could have used the lethal weapon. When found, as

stated, Mr. Hunt's body lay outstretched, face downward, at the end of the counter, his right hand in which he evidently had held the four $1 bills lay by his side; the left hand and arm were extended. It may readily be inferred that at the time the gun was drawn on him, Mr. Hunt was in the act of delivering the change for the $5 bill to the man who confronted him, and that as he stepped around the counter he faced the pistol. If he lunged toward this man with his left arm and hand extended, as he might well have done, and his body bent forward, the bullet could have entered below the collarbone on his left side and coursed diagonally downward to the right of his body.

The bullet which was taken from Mr. Hunt's body by Dr. Symmes was given by him to Deputy Sheriff Lyons, who testified that he put it in the hands of Sheriff White. Sheriff White testified that after receiving the bullet from Lyons, "I am the only one who handled this bullet that was taken from Mr. Hunt's body, and I was the only one that handled these hulls after they were turned over to me." The Sheriff further stated that the bullet which was taken from Hunt's body was marked and put in a little jar and the jar was placed in a locker in the Headquarters of the Law Enforcement Division in Columbia, to which point he carried this bullet and the two discharged shells which were found in the store.

Thereafter, on March 3, 1948, the sheriff, accompanied by a deputy, carried the pistol, the bullet and the two discharged shells to Washington, and turned these exhibits over to Mr. Zimmers, a technical ballistics expert with the Federal Bureau of Investigation. The examination was made by Mr. Zimmers on the same day. The sheriff and his deputy returned to Greenwood with these exhibits and they were put into a shoe box and placed in the vault in the office of the county treasurer of Greenwood County.

It is now common knowledge that by means of the science of ballistics, it may often be determined that a bullet was fired from a certain pistol, and it is the modern tendency of our courts to allow the introduction of expert testimony to show that the bullet which killed the deceased was fired from a particular pistol or rifle, where it is first definitely shown that the witness by whom such testimony is offered is, by experience and training, qualified to give an expert opinion in the field of ballistics. 22 C. J. S. Criminal Law, § 565, page 876; 26 Am. Jur., § 440, page 460. The weight of such testimony is for the determination of the jury.

Before giving his testimony concerning the comparison tests which he made, Mr. Zimmers, the technical ballistics expert, who had seven years experience in the firearms department of the Federal Bureau of Investigation, testified at length as to his qualifications and training. He stated that he had been a witness as a technical ballistics expert in about eighty cases, and he described in minute detail the tests upon which he predicated his unqualified opinion that the bullet which had been taken from the body of Mr. Hunt was fired from appellant's pistol. He explained that he had fired several test bullets from this pistol for the purpose of comparison. He testified in part as follows:

"A. The first thing I did was to examine the bullet superficially to determine whether it could have been fired in this gun, and when I determined that was so, I then proceeded to test the bullet and cartridge cases and compared that with the bullet and cartridge cases submitted by Sheriff White and that was carried out on an instrument known in the Fire-Arms Identification Department as a comparison microscope. That instrument consists of two separate and distinct compound microscopes which are joined by a common eye-piece. By having the two eye-pieces it is possible to view simultaneously two separate and distinct objects which are

placed on the two separate stages of this compound microscope.

"In so doing it is possible to examine the pattern of the miscroscopic marks which appear on the bullets which are fired from a particular weapon. The pattern of the microscopic markings if they are duplicated on both, that is, on a bullet which is removed from the person's body, and a bullet or bullets which are fired from the suspect's weapon, it is possible then to identify that particular weapon as having fired the bullet submitted for comparison, and such an examination as that was conducted in this case.

"The examination is based on these microscopic markings found on the surface of the bullet by virtue of the marks imparted to the bullet as it passes through the gun barrel. When a weapon is manufactured, the manufacturer will insert in the gun barrel a definite turn that is referred to as 'lands' and 'grooves'. The grooves are the portion which are cut into the gun barrel in a spiral motion so that any projectile fired through the gun barrel will have imparted to its surface the spiral motion to give the true trajectory while the bullet is in flight. The tools used in making these lands and grooves will impart to the surface of the gun barrel certain imperfections as the tools used are pulled through and along the gun barrel on the machining operation, which leaves small pits and lines on the inside of the gun barrel, and each of these will in turn impart to a bullet fired through the barrel of the gun a pattern of scratches which are characteristic to that gun barrel and to no other gun barrel. In addition to such marks left by the tool used to manufacture the gun barrel there are other marks which can be imparted by virtue of dust, rust, corrosion or anything else which might get into the gun barrel because the user has not taken care of it. By virtue of the aggregate number of imperfections on the inside of a gun barrel, and the manner in which these imperfections get there, it is safe to conclude that there could be no two weapons which will impart to the surface of a bullet the same pattern of microscopic markings.

"It has been found by scientific tests that it is not possible for two weapons to exist that impart the same pattern of microscopic markings. It is similar in this respect to finger printing examination where it has not yet been found that any two persons have identical finger prints. The same is true of weapons, each leaves its own identifying marks characteristic to that weapon alone and no other weapon can impart similar markings."

Mr. Zimmers gave detailed testimony as to the ejector and extractor markings of the weapon and the pattern imparted to the discharged shells, and fully explained to the jury by photographs magnified thirty times, the special and peculiar indentations made by the firing pin of appellant's pistol upon the cap in the cartridge case.

We have given careful consideration to the testimony contained in this voluminous record. No one of the various inculpating circumstances considered alone would be conclusive of appellant's guilt, but when all the facts and circumstances introduced in evidence are considered together, the trial judge, in our opinion, committed no error in submitting the case to the jury.

The State relies solely upon circumstantial evidence to connect the defendant with the crime committed. In passing upon the legal sufficiency of such evidence for a conviction of a felony, as in this case, we have uniformly held that the facts established or adduced on the hearing, must be of such nature and so connected or related as to point unerringly to the defendant's guilt and exclude any other reasonable hypothesis.

The rule is thus stated in *State v. Kimbrell,* 191 S. C. 238, 4 S. E. (2d) 121, 122: "Every circumstance which is relied upon by respondent as material must be brought to the test of strict proof. All of the facts proved must be consistent with each other, and, taken together, should be of a conclusive nature and tendency, producing a reasonable and moral

certainty that the appellant and no one else committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true, which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of appellant, then the proof fails. The reason for this is that all presumptions of law, independent of evidence, are in favor of innocence, and every person is presumed to be innocent until he is proved to be guilty. As has often been stated, it is not sufficient to establish a probability of guilt arising from the doctrine of chances that the fact charged is likely to be true."

The same principle was announced and followed in *State v. Manis*, 214 S. C. 99, 51 S. E. (2d) 370; *State v. Epes*, 209 S. C. 246, 39 S. E. (2d) 769; *State v. Takis*, 204 S. C. 140, 28 S. E. (2d) 679, and in many other cases.

In this case the incriminating evidence taken in its entirety if accepted and believed by the jury, would seem to be sufficient to warrant the verdict. The weight of the evidence and the credibility of the witnesses are matters exclusively in the province of the jury.

From the manifold forms which circumstantial evidence may assume, it can never be laid down as a matter of law what is sufficient to amount to proof of guilt so as to convict. In cases both of circumstantial and direct evidence, it must be such as to satisfy the jury of the guilt of the accused beyond a reasonable doubt and to a moral certainty. If it reaches that standard, the jury is justified in rendering a verdict of guilty. *State v. Mitchell*, 56 S. C. 524, 35 S. E. 210.

We have held in the cases above cited that the mere fact that the circumstances are strongly suspicious and the defendant's guilt probable, is not sufficient to sustain a conviction because the proof offered by the State must exclude every reasonable hypothesis except that of guilt, and must satisfy the jury beyond a reasonable doubt.

The two phrases, "[proof] beyond reasonable doubt" and "[proof] to a moral certainty," are synonymous and the legal equivalent of each other. *Jones v. State,* 100 Ala. 88, 14 So. 772; *Carlton v. People,* 150 Ill. 181, 37 N. E. 244, 41 Am. St. Rep. 346. These quoted phrases connote, however, a degree of proof distinguished from an absolute certainty. The reasonable doubt that the law in its mercy gives the benefit of the accused is not a weak or slight doubt, but a serious or strong and well founded doubt as to the truth of the charge. *State v. Bodie,* 33 S. C. 117, 11 S. E. 624.

In our opinion, the full summary of the incriminating facts is sufficient to excite more than suspicion as to the guilt of the accused. A careful scrutiny of the testimony shows that the time element afforded the appellant an opportunity to commit the crime, but far more appears than this. The jury was justified in believing that the bullet found in the body of Mr. Hunt was fired from appellant's pistol; and further they could reasonably reach the conclusion that this pistol had never left the possession of appellant; and that he fired the fatal shot.

As hereinabove mentioned, when this case was called for trial in the lower court the appellant was without counsel. The trial judge appointed the three members of the Greenwood Bar, who represented him in the trial court and argued his appeal before this court. They have discharged that duty and obligation with the highest degree of ability and fidelity, and this Court acknowledges their services with appreciation.

Judgment affirmed.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.