16547

STATE v. SMITH
(67 S. E. (2d) 82)

*Messrs. Charles & Charles and A. R. McElhaney,* of Greenwood, *for Appellant,*

*Mr. Hugh Beasley,* Solicitor, of Greenwood, *for Respondent.*

September 27, 1951.

STUKES, Justice.

Appellant, a Greenwood textile worker, has appealed from his conviction and life sentence for the poison murder of Hazel Arnold Smith, his bride of less than two months. He was previously married and very recently divorced, of which latter his first wife denied knowledge although she was separated from appellant and cooperated in the commencement of a divorce action. She gave damaging testimony against him which will be included in substance in the later summary of the State's evidence.

There are presented seven numbered "Questions Involved" which appear on the first page of appellant's brief in accord with Rule 8 of this court. Each of them will be stated and discussed, but not in the sequence presented. The first and sixth may be conveniently considered together, but others will necessarily overlap as will be seen. They are as follows:

1. Was it error for the trial court to refuse the defendant's motions for a directed verdict of not guilty?

6. Did the trial court err in refusing the defendant's motion for a new trial upon rendition of the verdict?

Motions for directed verdict of acquittal were made ██ at the close of the State's case and at the end of all of the evidence, and were overruled. The grounds of them were renewed by motion for new trial after verdict. Naturally these motions consisted mainly of the contention that the evidence was insufficient to support a verdict of guilty. Other points of the motions are preserved in other questions on appeal and will be considered in connection with them. Review of the evidence is necessary, and in greater detail because the case depends on circumstances. Of course, poison cases are ordinarily provable only by circumstantial evidence. One is not apt to see another administer poison to his victim. *State v. Epes*, 209 S. C. 246, 39 S. E. (2d) 769, 770. In the cited case it was said: "In proving *corpus deliciti*, the law demands the best proof which in the nature of the case is obtainable. Direct and positive evidence is not essential. It is now well established that the elements constituting the *corpus delicti* in a homicide case—the death of the person whose life is alleged to have been taken feloniously, and the criminal agency of another in taking the life of such person—may be sufficiently proved by presumptive or circumstantial evidence, where that is the best evidence obtainable. *State v. Thomas*, 159 S. C. 76, 156 S. E. 169; *State v. Gillis*, 73 S. C. 318, 53 S. E. 487, 5 L. R. A., N. S., 571, 114 Am. St. Rep. 95, 6 Ann. Cas. 993." Again at page 267 of 209 S. C., at page 778 of 39 S. E. (2d): "We are not concerned in this case with the weight and effect of the evidence or the credibility of the witnesses. These things are within the province of the jury. It is for us to determine solely whether there was sufficient evidence to go to the jury tending to prove the *corpus delicti* or criminal agency of the accused beyond a reasonable doubt.

"Much has been said in the arguments of counsel concerning the nature, weight and character of circumstantial

evidence. But all that we should require of circumstantial evidence is that there shall be positive proof of the facts from which the inference of guilt is to be drawn, and that that inference is the only one which could reasonably be drawn from the facts. All the circumstances taken together must point in the direction of guilt to a moral certainty to the exclusion of any other reasonable hypothesis. *State v. Kimbrell,* 191 S. C. 238, 4 S. E. (2d) 121." That is in harmony with the principles enunciated in the cases which are pressed in argument here, namely, *State v. Kimbrell, supra; State v. Dornberg,* 192 S. C. 513, 7 S. E. (2d) 467; *State v. Edwards,* 194 S. C. 410, 10 S. E. (2d) 587; *State v. Powell,* 202 S. C. 432, 25 S. E. (2d) 479; *State v. Takis,* 204 S. C. 140, 28 S. E. (2d) 679, and *State v. Manis,* 214 S. C. 99, 51 S. E. (2d) 370.

In appellate review of the propriety of the submission of the factual issue of guilt to the jury this court considers the evidence and inferences in the light most favorable for conviction, which they will reasonably support. "It must also be kept in mind that on an appeal from the refusal of the court to direct a verdict, the evidence and the inferences which may reasonably be drawn therefrom, must be viewed in the most favorable light for the State. *State v. Brown,* 205 S. C. 514, 32 S. E. (2d) 825; *State v. Turner,* 117 S. C. 470, 109 S. E. 119; *State v. Quinn,* 111 S. C. 174, 97 S. E. 62, 3 A. L. R. 1500." *State v. Epes, supra.* Apparently our last authority on the subject is *State v. Riley,* 1951, 219 S. C. 112, 64 S. E. (2d) 127, which was also a homicide appeal, opinion by Mr. Justice Taylor, in which it was said: "When considering a motion for a directed verdict in favor of a defendant, it is not the function of the Court to pass upon the weight of the evidence, but to determine its sufficiency to support the verdict. Where there is any evidence, however slight, on which the jury may justifiably find the existence or non-existence of material facts in issue, or if the evidence is of such character that different conclusions as

to such facts reasonably may be drawn therefrom, the issue should be submitted to the jury. *State v. Prince,* 165 S. C. 115, 162 S. E. 777; *State v. Gellis,* 158 S. C. 471, 155 S. E. 849; *State v. Rush,* 129 S. C. 43, 123 S. E. 765. The general rule is that, if there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury. *State v. Roddey,* 126 S. C. 499, 120 S. E. 359; *State v. Villepigue,* 127 S. C. 392, 121 S. E. 258; *State v. Walker,* 138 S. C. 293, 136 S. E. 215."

The appellant and the deceased during the latter part of January 1950, which was before their marriage on February 4, moved into an apartment in what is described in the testimony as the "Old Hotel" in the village of Hodges in Greenwood County. Several other families lived in other apartments in the same building and apparently all of the adult members testified for the prosecution. One of the men said that the deceased became ill on Thursday night before her death on Monday, April 3. On Friday midday he met appellant going away from the house and when the witness entered he saw appellant's bedroom door open, which was very unusual, and the deceased was lying across the bed, sick. A lady tenant came in and the witness left the room. He saw the deceased again about 5 o'clock that afternoon when she was vomiting in the sink on the back porch, the witness said, "the greenest stuff I believe I ever saw come out of a person." Appellant was not at home often and made no provision for any one to be with his wife when he was away. On Saturday afternoon he asked the witness to let him have some coal which the witness agreed to do expressly only on account of the deceased and asked appellant: "Aren't you ashamed of the way you treat that woman, letting her lay there and die without a doctor?" Appellant replied: "Oh, I've been giving her medicine." This witness did not work and was about the house practically all of the time but was

away on Sunday. On the day of the death, which was Monday, appellant called on the front porch for some one to come quick, that he believed his wife was having some kind of spell and dying. The witness went in, found the deceased dead and closed her mouth and eyes. Appellant then asked him to summon a doctor but when one was reached over the telephone, he declined to come when told of the death. Another neighbor called the father of the deceased. Appellant usually kept the doors to his apartment closed.

Another of the tenants, who moved out on Saturday before the death on Monday, on the preceding Saturday night came in from a late show and was requested by appellant to "go down the road and try to get her (the deceased) to come back home" or take her to Greenwood to her father. The witness so tried, overtook the deceased who was walking and gave her the message from appellant, but she refused. However, the witness saw her at home next day. He again saw her on Friday before her death, when she was very sick. He overheard arguments between appellant and the deceased. The wife of this witness also testified that she went into the bedroom of the deceased about noon on Friday before her death and found her very sick and vomiting from mouth and nostrils, and the deceased said that she was blind and knew that she was going to die, and that appellant had gone to get some one. However, no doctor came. The witness had overheard arguments between the couple. She and the deceased were friends and appellant was overheard to tell the deceased not to visit the rooms of the witness anymore. The latter incident was about two weeks before the death. The witness knew nothing about insurance having been taken out except what the deceased told her. Appellant did not stay regularly with the deceased, but she was home all the time. Asked on cross examination wherein appellant neglected his wife the witness replied: "He didn't have a doctor there for one thing. That looked like neglect to me." And when asked whether appellant appeared to be

affectionate and attentive to the deceased, the witness said, "I don't think so."

The State's witnesses whose testimony has just been reviewed, and another who lived in the same apartment building with appellant and his wife, testified that they knew of no rats in the building, which was in reply to other testimony that appellant explained to the investigating officers that he bought poison to kill rats at home.

The sheriff testified that he began an investigation of the death very shortly afterward, possibly before the body was buried. He took appellant into custody after he received from the coroner the report of the toxicologist. Upon arrest appellant was interviewed by the sheriff in the presence of other officers, including the coroner. He was told of the charge against him and that any statement might be used for or against him, that he would need a lawyer, to which he had the right; and appellant answered freely and voluntarily. He was asked about efforts to buy strychnine and admitted that he did so try at four places in Greenwood and three places in Anderson, but was refused. He said he did this in order to find out whether it could be purchased without a prescription, this because he suspected that his wife's father wanted to kill her; that his wife, the deceased, had told him that her father had abused her sexually and threatened her with death if she told. Appellant also admitted asking a Dr. Kinard on the street for a prescription for strychnine, followed him to his office but left without it; he gave the doctor an assumed name and false address. He admitted that he bought arsenic at a drug store to which he accompanied the officers, which was Dominick Drug Company. Upon inquiry for what purpose the purchase was made, he said to kill rats of which he had a lot; said he sprinkled it around the room, swept up what remained next morning and flushed it down the toilet. Two deputies accompanied him to the drug store and he identified the proprietor, Dr. Dominick, as the person from whom the arsenic was bought and the

kind of box container. The druggist testified that the box, of which a specimen was placed in evidence, was calcium arsenic, of which he sold a great deal, as did other drug stores, seed stores, etc., for use as an insecticide to kill potato bugs and the like. At the time he also sold in a round package lead arsenic which was less soluble.

A deputy sheriff who was present when the statements above related were made by appellant after his arrest, also testified, in corroboration of the sheriff. He added that upon appellant's admission that he had bought the box of arsenic, another deputy and the witness went with appellant to the drug store and when Dr. Dominick approached, appellant said, "There's the man that I bought it from." Next day appellant identified and picked out the square type of box, like that which he said he bought. It was put in evidence and referred to by the toxicologist in his testimony which will be later narrated.

Another deputy sheriff testified that he went to appellant's home on the date of the death of his wife and interviewed him. He helped him decide upon and call an undertaker and afterward the witness inquired whether there was any insurance. Appellant's reply was to the effect that he did not know, that he had some policies which he would get and they would see. He then produced five, six or seven policies on his wife, of which appellant was the beneficiary, and the witness noticed that they were of recent date. When the witness was asked whether appellant seemed disturbed over the death of his wife, he replied: "At times he did and times he didn't." He was crying when the officer arrived but "braced up" to talk business.

The druggist at Oregon Pharmacy, Greenwood, identified appellant as having come in the store during the last of February or some time in March 1950 and asked to buy poison to put in groceries because on weekends when he was away from home they were being stolen and he wanted to poison the groceries in order to kill the thief. The witness

refused to make the sale. The proprietor of Bennett's Drug Store, Greenwood, similarly testified to appellant's effort some time in March to buy from him poison to put on his foodstuffs which some one had been stealing, he said, and this witness also refused to sell poison to appellant.

Appellant's first wife was a witness for the State. They were married on October 31, 1940, and had a son now eight years old. They lived on Jackson Street in Greenwood and both worked at Greenwood Mill. They were separated a few days before Christmas 1949 and agreed that she should have the child and the household furniture. Afterward appellant visited her at her boarding house and tried to persuade her to live with him again. He told her he would kill the deceased. The witness said to him that there was no use getting in trouble and he replied he would not, explaining, "She has been in the asylum." When the witness persisted in her refusal to live again with appellant, she said, "he jumped on me and beat me." This was on Thursday night of the first week of February 1950 but appellant had before during their separation been continuously after the witness to live again with him, would follow her to work in the mill at night and threaten to kill her if she did not consent to return to him. The witness further described the physical attack on her by appellant in February as follows: "He grabbed me around the neck and choked me, and I screamed, and the lady in the other room come and called the City Law, and he hit me over my right eye. My eye was black. When the Law come over there, he was gone, but when they come back to town, why, the City Law got him, and it cost him a hundred dollars." After that occurrence she left Greenwood and remained away until her return for the trial. On cross examination the witness disclosed that before her marriage to appellant she was the wife of Bert Savage by whom she had several children. She had an older daughter by another man and this daughter, with her permission, married Bert Savage after divorce of the latter from her. She admitted that she knew soon after the separa-

tion of the divorce action of appellant against her and she "signed a paper" for it, but appellant afterwards said that it would be withdrawn and she denied further knowledge of it. At the time of the trial she was unemployed and living in Georgia with a brother, and has had her son by appellant with her since the latter's arrest. During their married life insurance was carried on the witness, on her husband and their child, on which she paid the premiums part of the time.

Dr. John D. Harrison, a 1943 medical graduate of Johns Hopkins University and a Greenwood practitioner, was called by appellant to visit his wife, the deceased, on April 2nd, which he did at about 11o'clock a. m. She told him that she was weak, had been vomiting several days and unable to retain even water, particularly during the preceding twenty-four hours. No serious symptom was discovered by the doctor and he left three capsules of a mild sedative to be given as needed. In addition to appellant, the father of the deceased and other relatives and friends were present and either appellant or the father told the doctor that the deceased had been a patient in the State Hospital. He instructed that she be brought to his office next day. About noon of that day appellant called the doctor again and requested that he go as promptly as possible, quoting the doctor, "that his (appellant's) wife was hemorrhaging, and upon a little further questions, he told me that his wife was stiff, that he thought she was dead." The doctor got the coroner and they went together to appellant's home where he examined the deceased, found rigor mortis and believed that she had been dead for two hours. He had the body transferred to a funeral home where he later performed an autopsy but was unable to determine the cause of death. There was no external mark of violence except a contusion of the scalp on the top of the head, about two or three weeks old, but not extending into the skull. The stomach contained about three ounces of dark bile stained fluid. There were scattered pinpoint hemorrhages throughout the lining of the stomach. There was no preg-

nancy. The .microscopic examination showed a swelling of the liver and kidneys. The chemical analysis, to which the Clemson toxicologist had already testified, showed arsenic trioxide in quantity fifty times sufficient to cause death and in the doctor's unqualified opinion the cause of death was arsenic poisoning. There was no food in the stomach, which showed that the deceased had not eaten recently. The effect of arsenic poisoning upon a body is not predictable. In some cases there may be vague sickness for several days, with vomiting, but usually, after the lethal dose death occurs in a matter of hours, up to twelve. There may be fifty to one hundred symptoms which arsenic can produce; the average, victim will exhibit three, four or five, but rarely the same in any two cases. In most cases there are stomach and intestinal symptoms, nausea, vomiting, diarrhea, one or more. Strychnine affects the central nervous system, the brain and spinal cord, whereas the primary action of arsenic is upon the intestinal tract. A victim of strychnine has convulsions, with extreme arching of the back, drawing of the neck and rigidity, and usually dies from paralysis. The doctor thought that if the lethal dose of arsenic had been taken by the deceased prior to his visit on Sunday, she would have been dead then, although there are reported cases where lingering death results—a week or ten days. In retrospect, there were evidences of arsenic poisoning at the time of his visit on Sunday but it did not then occur to the doctor to suspect it and, in his opinion, the fatal dose had not been administered at that time. The deceased was noncommittal on his visit and would answer his questions only after repetition. The doctor asked for permission to perform an autopsy examination because he wanted to know the cause of death and neither appellant nor the father of the deceased objected.

The county coroner participated in the investigation of the death and testified that the specimen from the body furnished by Dr. Harrison was carried by him to Clemson College and delivered personally to Dr. Webb, the toxicologist,

which was April 4th. Ten days later, on April 14th, he delivered the second specimen procured for him by the undertaker. The specimens were contained in jars and were not marked, until the name of the deceased was put upon them by the toxicologist in his presence. However, they were kept in the possession of the coroner during the trips to Clemson and he had never handled any other body specimens. He was present at the autopsy which was performed by Dr. Harrison. On the first trip to Clemson he was accompanied by a deputy sheriff; on the second he went alone and did not leave his automobile during the trip.

The toxicologist, a Ph.D. in chemistry of Cornell University, told the coroner when he delivered the first specimen of about 50 cc. of liquid from the body of the deceased that it was too small for analysis, and, upon testing, it was negative, as he anticipated. Ten days later the coroner delivered a larger specimen which was contained in a jar and immediately labeled by the chemist with the name of the deceased, from the information given him by the coroner. In much detail and extended cross examination he described the chemical process by which he analyzed the specimen for arsenic and found .076 grains of arsenic trioxide per 100 grams of specimen. This result came from separate and independent use of two tests for arsenic, known, respectively, as the Marsh test and Gutzert's test. The arsenic was isolated by means of the use of an acid. The compound found is insoluble in water and in suspension makes a milky substance. It does become somewhat soluble by the action of the digestive juices in the body. The precaution was taken to run what the doctor called a "blank" along with the tests, the specimen having been divided into four parts, to make certain that there was no contamination in the chemicals used. The specimen had been embalmed but that had no effect upon the arsenic in the body. Arsenic is a metallic poison and not affected by the formaldehyde contained in embalming fluid. The chemist made a written report of the results of his examination of the specimen and it was introduced in evidence

It recited the above findings and that the specimen consisted of what appeared to be two sections of the large intestine and a small portion of the stomach. The chemist was shown a box of calcium arsenic, which appellant had told the sheriff was similar to his purchase from the drug store, and the witness said that it contained at least forty per cent arsenic trioxide and was an insecticide, but the label said thirty-four per cent. The content of the specimen which was analyzed indicated that arsenic was probably, also imbedded in the tissues of the body.

The undertaker who was called at the time of the death, embalmed the body and conducted the funeral on the following Wednesday, produced in evidence specimens of the embalming fluids of the kind he used. He testified that they contained no arsenic.

The prosecution established the procurement by appellant and attempted collection of insurance upon the life of the deceased as a motive for the crime. Details of the numerous policies will be discussed later. The officers were unable to get them to put in evidence but they knew that actions had been brought upon them against the insurers by an assignee-trustee and the complaints were on file in the office of the clerk of court. The assignee was a member of the bar but not of counsel for appellant. However, his attorneys in the civil suits on the policies were the same two attorneys who were defending appellant in the criminal trial. The State subpoenaed all three to produce the policies. The court excused the jury, who went to their room, and the three attorneys were, one by one, put upon the witness stand and examined by the solicitor. The court declined, on objection, to require the production of the policies.

More took place in this connection in the absence of the jury than in their presence. However, the following transpired after their return and in their presence: One of the two attorneys who occupied the dual role of attorney for the assignee-trustee in the civil actions and also attorney for

appellant in the criminal prosecution, was asked by the solicitor, who called him as a witness, whether he had seen the life insurance polices and he was required to answer over objection, which he did in the following words: "I saw an instrument which was shown to me which was alleged to be an insurance policy between these parties." That answer was applicable to a certain specified policy. To a similar question relating to another he said: "I recall the policy, but I don't recall the double indemnity provision." To another, the answer was, "Solicitor, I have seen a policy, but I don't recall the date." To another: "I have seen an alleged policy from that company. I don't know whether it was in force or not. I don't recall the date." With reference to the other policies the answers of the witness were substantially the same. As to the civil actions, in which the summons and complaints had been filed in the office of the Clerk of Court and the cases docketed for trial, the witness said that the assignee of the beneficiary was the plaintiff and he, the witness, and Charles & Charles were the attorneys for the plaintiff. All of this was over the objection of appellant's attorneys. The pleadings in the civil actions were not admitted in evidence at that time but were marked for identification. There were five such actions upon five policies of insurance which were brought separately against the five insuring companies.

The Clerk of Court was then called as a witness for the State and identified the pleadings in the civil actions upon the policies as having been previously filed on specified dates in his office. The court thereupon admitted the pleadings as evidence of the existence or issuance of the policies, not that they were in force, and not as evidence of the trustee relationship.

The other counsel for appellant, who was likewise also an attorney of record for the assignee-trustee of the policies in the civil actions, was called as a witness by the State and admitted that he had been served with a subpoena *duces tecum* to produce the policies which were described in detail

and he evasively declined to produce them, saying in evidence: "I don't know that I've got these insurance policies. I haven't produced any policies." As said, the court declined to require the production of the policies.

Appellant's questions on appeal which relate to the last foregoing are as follows:

2. In a criminal case, can the State, in the presence of the trial jury, demand of the accused, or his counsel, possession of incriminating documents without violating his constitutional right not to be compelled to be a witness against himself?

4. Did the trial court err in requiring the defendant's counsel to testify, over objection, as State's witnesses?

If the existence of the insurance had not been competently proven otherwise, and in fact it was by the testimony of the managers of the respective Greenwood district offices of the several insurance companies as will hereinafter be described, serious question of prejudicial error would arise from the unusual course followed by the solicitor and permitted by the court. But it is unnecessary to further examine the question here because of the other unquestionably proper proof of the insurance. On the interesting subject of the propriety of calling upon an accused or his counsel in the presence of the jury to produce an incriminating document, see 14 Am. Jur. 872 *et seq., Criminal Law,* sec. 149; and annotation, 110 A. L. R. 101.

The above stated questions 2 and 4 became academic, as did appellant's question 5, upon reception of independent proof of the insurance. We shall now advert to that question and that proof.

At the close of the evidence in chief for the State and in the absence of the jury, the solicitor moved to strike from the record the pleadings in the civil actions upon the policies, explaining that during the preceding night recess of the trial he had discovered the apparent applicability of section 475

of the Code of Civil Procedure of 1942. It prescribes how a pleading shall be verified and contains a provision toward the end, as follows: "And no pleading can be used in a criminal prosecution against the party as a proof of a fact admitted or alleged in such pleading". It is noted that the appellant was not a party to the actions in which the summons and complaints were admitted in evidence. Appellant objected to the motion to withdraw the pleadings from evidence upon the ground that the damage of them was done. It is not necessary to further discuss this purported question, which is No. 5 of those submitted by appellant, because the pleadings were only evidence of the existence of the insurance which was competently and conclusively proven otherwise, as will be presently seen. This answers the contention of error (appellant's question 5) which arises out of the court's ensuing refusal to declare a mistrial for which appellant moved upon the alleged ground of the admission in evidence of the pleadings and the subsequent striking of them from the record on motion of the State.

However, it is now belatedly contended by counsel that the other evidence of the insurance was erroneously admitted because it did not consist of the original policies, which they strenuously and successfully refused to produce from their possession, or duplicate copies. The point is not included in their "questions involved" but if it be thought that the gravity of the case justifies waiver of the applicable rule, examination of the contention discloses that it is completely without merit.

All that had transpired in the trial with reference to the policies became immaterial, if error, by reason of the subsequent testimony of the representatives of the several insurance companies, who were called by the State. The first was the District Manager at Greenwood for Palmetto State Life Insurance Company. After preliminary questions and answers he testified that appellant carried his wife (the deceased) to the district office in late February and

applied for insurance on her life which was issued March 6 for $1,000.00, double indemnity for accidental death, forty-two cents weekly premium, of which appellant paid two. At this point in the testimony appellant's counsel for the first time objected, upon the ground of the best evidence rule, and the court overruled the objection. There was no motion to strike the earlier testimony of the witness, which has been stated. Thus the objection, if sound, was not timely made; it came too late. Moreover, and likewise conclusive, without renewal of the objection and without any reservation, appellant's counsel cross examined the witness at length with respect to this and other policies which appellant had from time to time in the past procured from the company on the lives of his former wife and their child, some or all lapsed. Under these circumstances it is clear, on reason and authority, if there was error it was waived. *Sinclair Refining Co. v. Stroup,* 194 S. C. 79, 9 S. E. (2d) 214, and cases there cited.

Again, if there was error in the above it was rendered entirely immaterial by the similar testimony of the district managers of four other industrial insurance companies which had issued at about the same short time before the death, similar policies on the life of the deceased, at appellant's instance and with him the beneficiary, in the respective face amounts of $3,000.00 (upon medical examination), $1,000.00, $1,000.00, and $1,000.00, with double indemnity for accidental death, and an additional policy of $1,000.00 accident insurance. At the time of the death of the insured premiums were in arrears on most, if not all, of the several policies, and they were in force by reason of the grace periods provided for the payment of the weekly or monthly premiums. This testimony of the district office managers of the four additional companies was received without semblance of objection to its competency, which renders unimportant the tardy objection to that concerning the policy issued by the Palmetto Company under similar circumstances.

The record further indicates that the making of this ▮ matter a contended ground for reversal is afterthought, and inconsistent with counsel's position at the trial. Arguing against the propriety of requiring him to produce, or testify to the contents of, the policies, appellant's chief counsel stated to the court: "If he (referring to the prosecuting solicitor—interpolated) wants to know the contents of the policies, he has a way of getting it. He can subpoena the agents of the company who wrote those policies." This was exactly the course subsequently pursued by the solicitor, as shown in the above recitals from the record, and it does not lie in the mouth of appellant's counsel to now charge error thereabout. After the above incident, counsel said again: "He has another way. We would like to examine the insurance agents." Again, counsel later said: "The best evidence is available here by insurance companies in Greenwood."

Our last foregoing conclusion reflects the view of the trial judge in his ruling upon motion for new trial which was made immediately after verdict. It appears at pp. 370-380, inclusive, of the appeal record and consists largely of enlightening colloquy between court and counsel. The following excerpts are from pp. 374, 377:

"*The Court:* There was no objection to the insurance agents' testimony.

"*Mr. Charles:* The withdrawal of that record, you can't erase from the mind of the jury any inference that they might have drawn from it. The very fact that suit had been brought created some impression on the layman's mind. Whether the policies had been paid or not paid was not before the jury.

"*The Court:* Didn't the agents testify it hadn't been paid?

"*Mr. Charles:* Yes.

"*The Court:* There was no objection to that?

"*Mr. Charles:* No, no objection to it.

\* \* \*

"*The Court:* What you have stated would be absolutely sound if it were not for the fact what was published to the jury by the pleadings by the Solicitor asking questions was competently brought in when the insurance agents were on the witness stand.

"*Mr. Charles:* He didn't bring out by those witnesses that suit had been brought against them.

"*The Court:* No, sir.

"*Mr. Charles:* I agree that he did prove what was in that suit and policies by the agents, but he didn't prove he brought this suit."

The evidence which has been recited above constituted the case in chief for the prosecution. The appellant did not testify but his counsel called several witnesses, to whose testimoney we now turn.

The young sister of the deceased, who was a pupil at John De la Howe School, took the stand. She is the only other child of their parents and the mother is dead. She said that she had seen appellant and her sister "maybe" on weekends and she "guessed" that appellant was devoted to his deceased wife. When asked whether the appellant seemed disturbed by the loss of his wife, the witness answered that he seemed, quoting, "very much aware of her death and all," and appeared to be grieved and she "reckoned" that he shed tears. On cross examination the witness recalled that she went with her deceased sister to the office of the solicitor about the first of February when her sister and appellant were living apart, and she tried to persuade her sister not to go back to appellant and objected very strongly, giving as her reason: "Well, because I didn't think that was the right thing for her to do at that time especially." The witness went with her father to visit her deceased sister for about an hour on Sunday before the latter's death on Monday and when asked the attitude of her sister toward appellant at that time, she replied, "Well, I don't exactly know." And she said that appellant did not leave the deceased during her

visit, being present all of the time. In reply, she was asked if she had not gone to see appellant, too, and she answered: "I can't say that."

Appellant also called his sister-in-law as a witness. She was then living in Georgia but formerly in Anderson County. She testified that in March before the death, appellant took the deceased to the home of the witness and carried her bodily into the house and laid her on a bed, sick, but the witness paid little attention and one of her replies to the solicitor on cross examination was, "I didn't see nothing." A doctor from Anderson was called but did not talk to the deceased, the witness saying, "She didn't move or speak and the doctor said she had a convulsion." On the next morning, which was Friday, March 18th, the witness talked to the deceased in the presence of appellant and the deceased said, "You know, I am tired of living. I'm going to get something to poison me." She then left the house but appellant brought her back. She would not eat breakfast and said she had a headache.

Upon defense counsel's stated theory of possible suicide of the deceased, the court admitted the testimony of a member of the medical staff of the State Hospital for the Insane to the effect that the deceased was admitted there as a patient on July 7, 1949, and paroled in the care of her father on Oct. 5, 1949. He diagnosed her mental illness as dementia praecox; she was depressed and objected to confinement in the hospital, was evasive, suspicious of strangers, and confused mentally. She read her Bible a great deal, underscored passages, professed Christianity and that she was saved. She talked of communication with God and with the birds at home. She was received from Edgewood Sanitarium which is a private institution for the treatment of the mentally ill. She willingly went home with her father when released from the hospital in October, 1949, and was desirous of obtaining work. She did not return to the hospital.

The founder and director of Edgewood Sanitarium who is a psychiatrist, also testified for the defense. The deceased was brought to his institution by her father and a social worker on June 22, 1949, and remained there as a patient until July 7, 1949. His diagnosis agreed with that of the State Hospital doctor and he further described the malady as a split in personality with poor reasoning, poor thinking and poor judgment. When asked if the deceased was depressed he replied that her mood was "rather bizarre." She would stand by the hour, gaze out and talk to the birds, sometimes having to be forced to eat her meals. She read the Bible abnormally and had a marked hostility toward her father, wanted to be alone and did not want to return to live with him. (It is inferable from the above testimony of the representative of the State Hospital that this attitude toward her father changed during her stay there. Neither hospital doctor testified to any suicidal attempt or tendency.)

A remarkable witness for the defense was the Doctor Kinard referred to in the testimony above of the sheriff, who appellant said he had asked on the street for a prescription for strychnine, followed the doctor to his office but left without it. At the time of the death the witness was practicing in Greenwood as an eye, etc., specialist but by the time of the trial he had moved to another city. He testified that the deceased went to his office by appointment on a Sunday in March and he removed a cinder from her eye. He said that a few days later he met her on the street and she asked him for a prescription for some kind of arsenic which he told her she could buy without a prescription; she appeared to be nervous and upset and referred in conversation to going back to the State Hospital, which she said she did not want to do, and the witness got the impression from the conversation that she might take arsenic. Afterward appellant came to his office and inquired whether the deceased had obtained a prescription for poison, which she wanted, and the witness informed him that he did not give it to her. On cross examination the witness identified the sheriff, a deputy and the

chief of police, whom he knew. He admitted discussing the case with the deputy but not in detail, he thought, and he did not remember what was said. He admitted a conversation on the preceding day, which was the first day of the trial, in a jury room during a recess, at which the sheriff, the chief of police and the solicitor were present; further that the solicitor asked him what he knew about the case and when asked whether he then mentioned the conversation with the deceased on the street, he replied: "I didn't tell you all I knew because I didn't think it was my place to tell it in there.  *  *  *  I thought I'd tell it on the stand." The following is an excerpt from the record at this point:

"Q. (By the solicitor) Doctor, I want to ask you, as a matter of fact, did you not tell us that the only time Mrs. Smith was at your office was when she came there and you got a cinder out of her eye? A. I don't remember just what I said in there. I told you I'd tell it in here in a few minutes.

"Q. Doctor, you didn't make any such statement as that, now, did you? A. That's what I thought I told you."

The witness admitted that he had previously told the officers that when appellant came to his office he did not give his name as Smith, the witness thought, "Brown", and asked for a prescription for arsenic, said something about a horse and wanted some poison. When pressed by the solicitor for not mentioning before the fact, to which he testified, that the deceased asked for a prescription for arsenic, the witness replied: "I didn't think that was the place for me to tell everything in there.  *  *  *  Well, there was no reason I should tell it to you."

The State offered as witnesses in reply to, and contradiction of, the testimony of Dr. Kinard, the sheriff, his deputy and the police chief. The deputy testified that in the course of his investigation he talked to Dr. Kinard at his office and described the interview as follows:

"A. I carried a picture of Smith (appellant) over there and asked him did he know that man. He said yes. Said he

come in here, said I run up with him down in the lobby, got on the elevator and come up in the office, and told me he wanted enough strychnine to kill a small horse. He didn't mention arsenic. He said strychnine to kill a small horse. Dr. Kinard went over it two or three times, he said it over and over, 'small horse, small horse' you know how he talked.,

"Q. You said strychnine? A. Yes, sir, he said strychnine. I talked to him about it different occasions. The first time was in the office. Dr. Kinard has been in my home at another time."

The deputy further testified that in his talks with Dr. Kinard the latter had never mentioned that the deceased had approached him about a prescription. The witness was not cross examined by defense counsel.

In his reply testimony the sheriff said that he, the solicitor and the chief of police conferred during a recess of the court on the day before with Dr. Kinard, and heard the solicitor request the latter to tell what he knew about the case. Dr. Kinard replied that appellant came to his office and wanted a prescription for arsenic. The doctor was not subpoenaed as a witness by the State because appellant had previously admitted to the officers that he had followed Dr. Kinard to his office and asked about a prescription for strychnine. Again, there was no cross examination.

The chief of police, who had formerly been such in Elberton, Ga., and had served for over four years as a Special Agent of the Federal Bureau of Investigation, testified to his presence at the interview of the officers with Dr. Kinard on the day before and that the latter told about the appellant coming to him for a prescription for arsenic and the doctor made no statement to the effect that he would tell what he knew on the stand; in fact, he then appeared to be very cooperative. The witness also said that in reply to a question at this interview as to whether he knew the deceased, the doctor said that he had seen her on one occasion to treat

her eye for a cinder. There was likewise no cross examination of this reply witness.

Thus ends tedious review of all of the material evidence which was adduced at the trial by the State and by the defense. We think that consideration of it is convincing that the trial judge did not err when he refused the motions for directed verdict and for new trial after verdict. The issue of the guilt of the appellant was clearly for the jury. This answers adversely to appellant his questions numbered 1 and 6, which are set forth hereinabove. *State v. Hackett,* 1949, 215 S. C. 434, 55 S. E. (2d) 696, is a valuable recent authority on the sufficiency of proof of guilt by circumstantial evidence. It was also the affirmance of a conviction for murder in Greenwood county, with punishment of life imprisonment. In the opinion, we said, 215 S. C. at pages 448, 449, 55 S. E. (2d) at page 702 : "From the manifold forms which circumstantial evidence may assume, it can never be laid down as a matter of law what is sufficient to amount to proof of guilt so as to convict. In cases both of circumstantial and direct evidence it must be such as to satisfy the jury of the guilt of the accused beyond a reasonable doubt and to a moral certainty. If it reaches that standard the jury is justified in rendering a verdict of guilty. *State v. Mitchell,* 56 S. C. 524, 35 S. E. 210. * * * The two phrases (proof), beyond reasonable doubt' and '(proof) to a moral certainty,' are synonymous and the legal equivalent of each other. *Jones v. State,* 100 Ala. 88, 14 So. 772; *Carlton v. People,* 150 Ill. 181, 37 N. E. 244, 41 Am. St. Rep. 346. These quoted phrases connote, however, a degree of proof distinguished from an absolute certainty. The reasonable doubt that the law in its mercy gives the benefit of the accused is not a weak or slight doubt, but a serious or strong and well founded doubt as to the truth of the charge. *State v. Bodie,* 33 S. C. 117, 11 S. E. 624."

3. Did the trial court abuse its discretion in refusing the defendant's motion that the trial jury be kept together during the course of the trial?

The court refused to confine the jury overnight, which defense counsel requested. They were kept together during court hours and in charge of officers at all times during the three days of trial but they were allowed to go to their respective homes at night after stern warning from the court that they should not communicate with others, or allow others to communicate with them, concerning the case in any manner, with other appropriate admonitions. This was within the discretion of the trial judge and certainly constitutes no ground for reversal in the absence of any showing of resulting prejudice to appellant, of which there is none. *State v. Dawson,* 203 S. C. 167, 26 S. E. (2d) 506.

7. Did the trial court err in failing to grant the defendant's motion for a new trial on after-discovered evidence?

Some time after conviction and refusal of new trial on the minutes appellant's counsel filed a lengthy petition for new trial upon the ground, in substance, that they had just discovered that the second and adequate speciment from the body of the deceased was obtained after embalming, when the body awaited burial in Anderson, and that the specimen was carelessly handled before delivery to the toxicologist for analysis. Counter affidavits were submitted by the State in reply to the contentions upon which the motion was made.

The undertaker and embalmer deposed that the coroner informed him that the specimen secured at the time of the *post mortem* examination was of insufficient quantity and deponent agreed to obtain another, which he did with the aid of an assistant on April 5, two days after the death and embalming. He placed the specimen from the body in a jar containing formaldehyde and locked it in the trunk of his car until he returned to his place of business in Greenwood. He then gave it to an employee who delivered it at the headquarters of the coroner, which is a service station, whence the coroner operates an ambulance. The deponent was most positive that the specimen was taken from the body of the deceased and not tampered with before he handed it to his

employee to deliver to the coroner. One of appellant's counsel talked to the deponent before trial and all questions were fully answered. He expressly denied counsel's assertion that the conviction had worried him, particularly because his contacts and conversation with the appellant when he was called to take the body of the deceased convinced him that appellant then made deliberate misstatements concerning the death, which, with the facts developed at the trial, convinced deponent beyond a reasonable doubt that appellant committed the crime. He further said that it was impossible for the embalming fluid to have deposited arsenic in the body because the fluid contained no arsenic.

The undertaker's employee said under oath that when the specimen was given to him by the undertaker upon his return from Anderson, it was in a glass jar which he carried to the service station and inquired for the coroner. Upon the latter's absence the jar containing the specimen was delivered to the manager of the station and was not meanwhile opened or tampered with in any way. The station manager averred that when the jar was left with him, in the absence of the coroner, he in a few minutes turned it over to Hr. Harold Smith who assisted the coroner in his ambulance business. Mr. Smith confirmed this and said that he carried it to his grocery store and place it in the refrigerator. On the next day he put the jar in a paper bag which he tied and set it in a place in his store to which customers had no access and his only clerk knew nothing about it; and it stayed there until personally delivered to the coroner. Smith's clerk also deposed that he knew nothing of the secreting of the specimen in the store and either he or the proprietor, Mr. Smith, was in the store at all times that it was open.

The coroner made affidavit that Dr. Harrison, who performed the autopsy, turned the first specimen over to him and he took it to the toxicologist at Clemson College who requested that a larger specimen be furnished. He asked the undertaker to procure it from the body which had been embalmed and was in Anderson. Later the undertaker informed

him that the specimen had been obtained and sent to the service station, which was deponent's headquarters. There he learned that Mr. Smith had taken it to his grocery store to place it on ice which deponent was advised was unnecessary because it was in formaldehyde. Some ten days later he took the specimen from the store and carried it to Clemson where identification was placed on it by the doctor in his presence. Depondent never handled any other specimen or contents from a stomach.

In a well written order which evidences careful consideration the court refused the motion, holding that it failed to meet the first three requirements for the granting of such, as set forth in *State v. Strickland,* 201 S. C. 170, 22 S. E. (2d) 417, which is the only authority cited to the point in appellant's brief. It was said in the order: "The affidavits for the State trace the handling of the specimen from the time of removal until the time of delivery and controvert all suggestions or inferences of substitution or tampering. Counsel for defendant had ample opportunity in the preparation of the trial of the case to have learned what they' now consider to be after discovered evidence. Interrogation of those witnesses named in their affidavits would have revealed what is now set forth in their sworn statements. These same matters could have been brought out upon cross examination in the trial of the case. If the contents of the affidavits relied upon by the defendant for a new trial had been brought out at the trial, I am fully convinced of the absence of any probability that such evidence would have changed the result of the trial, or would change the result if a new trial were granted."

In addition it may be said that counsel for appellant discussed the case before trial with the undertaker and the coroner and had ample opportunity to learn all of the facts which they adduced at the hearing upon the motion. Moreover, the coroner was the very first witness for the State and testified that ten days elapsed between his trips to Clemson with the separate specimens for analysis. The undertaker

also testified at the trial, as noted above, and was subjected to cross examination.

The court did not err in denying the motion upon ■ the allegedly after-discovered evidence. The rule in such cases, cited above from *State v. Strickland,* 201 S. C. 170, 22 S. E. (2d) 417, was very recently re-stated in *Elmore v. Middlesex Ins. Co.,* 1951, S. C., 65 S. E. (2d) 871, 874, opinion by Mr. Justice Taylor, as follows. "The fourth question is that the Court erred in refusing appellant's motion for a new trial based upon after discovered evidence. It is sufficient to say that such motions are addressed to the discretion of the Circuit Court and that the ruling therein will not be disturbed unless the Trial Judge has manifestly abused such discretion and thereby committed error at law."

Significantly, appellant's counsel in their several questions and in the 56-page brief make no complaint or criticism of the charge to the jury by the court. The record indicates the judge's determination that appellant should receive a fair and impartial trial, and we are convinced that he did. The 412-page, typed, *in forma pauperis,* record has been repeatedly read and studied in the light of the elaborate argument of counsel, and no prejudicial error is found.

The exceptions are overruled and the judgment affirmed.

F'shburne and Oxner, JJ., and E. H. Henderson, Acting Associate Justice, concur.

Taylor ,J. dissents.

Baker, C. J., not participating.

Taylor, Justice (dissenting).

The appellant was tried at the September 1950 term of General Sessions Court for Greenwood County and convicted of the charge of murder, with the jury recommending mercy.

Appellant on February 4, 1950, married Hazel Pauline Arnold, who died on April 3, 1950, in Hodges, South Caro-

lina. On the day prior to her death Dr. John Harrison, a practicing physician of Greenwood, South Carolina, was called to minister to Mrs. Smith; not being alarmed over her condition, he prescribed mild sedatives. The next day he was again requested by appellant to visit his wife and upon arrival at the home found her dead. Dr. Harrison asked for and obtained permission to perform an autopsy, which he did, and removed certain fluids from the colon, which he turned over to Clemson College for chemical analysis. Approximately twelve days later a second specimen was removed from the body and turned over to the same persons for the purpose of making further tests. This last specimen was reported to contain arsenic sufficient to cause death.

Upon trial of the case the State was forced to rely upon circumstantial evidence and undertook to prove as a motive the existence of $7,000.00 life insurance carried upon the life of the deceased with the husband as beneficiary. The insurance companies refused to honor appellant's claims under the policies, as a result of which he directed that these policies be turned over to his attorneys and executed an assignment of same to Mr. N. A. Harrison, a Greenwood attorney, as trustee, and directed him as such to institute civil action for the collection of the amounts set forth in the policies, which was done prior to trial.

During the noon recess of the first day of the trial the Solicitor caused to be served on appellant's counsel and trustee a subpoena *duces tecum*, directing that they appear and produce the original policies of insurance in order that they might be introduced into evidence by the State. The Solicitor then demanded of appellant's counsel the policies in open court. This counsel refused and they were, over their objection and in the absence of the jury, placed on the stand by the prosecution and examined concerning the contents of the policies and their whereabouts. Counsel strongly objected to this procedure on the grounds generally that it was highly prejudicial to the appellant in that it compelled

his own counsel to give evidence against him in violation· of his constitutional rights, in effect forcing him to give evidence against himself; further that such information as counsel had thereabouts was privileged communication.

The Trial Court sustained defense counsel's objection and refused to permit their examination for this purpose in the presence of the jury, ruling that counsel could not be compelled to produce the policies but permitted, over counsel's objections, the calling of them as witnesses for the State in that they were examined concerning the pleadings in the civil cases which had been served and filed in the Clerk of Court's office for the purpose of collecting the amount of insurance set forth in the policies. Counsel, being compelled to testify as to these pleadings, identify them and state their nature, and such pleadings were introduced into the evidence. Later, near the close of the State's testimony, the Solicitor announced to the court that he was of the opinion that the pleadings served in the civil suits were inadmissible under Section 475 of the 1942 Code and moved that such pleadings be withdrawn. This motion was granted with instructions to the jury that the evidence was inadmissible and that they should disregard it. Whereupon, counsel for appellant moved for a mistrial on the grounds that this evidence was highly prejudicial to the appellant, that the State had derived all the benefit therefrom, that the question of insurance was so instilled in the jury's mind that instructions from the Trial Judge could not at that time serve to cure the harm done. This motion was denied.

The prosecution then offered testimony of district managers and agents of various insurance companies as the next best evidence as to the existence and contents of the policies, all of which was objected to on the grounds that such testimony was not the best evidence and therefore incompetent.· The insurance companies' field agents were permitted to testify as to the existence of the insurance and of its being

in force. This too was objected to as a violation of the best evidence rule.

Appellant now comes to this Court upon a number of exceptions which present several questions. However, in my view it is necessary to discuss only exception 12 which purports error in overruling appellant's objection to testimony of insurance agents and managers as to contents of insurance policies on life of deceased as being in violation of the best evidence rule.

"According to the great weight of authority in this country, where primary evidence is not available so that a fact may be proved by secondary evidence, the proponent of the secondary evidence is required to produce the best secondary evidence which exists and which is in his power to produce. In other words, the secondary evidence which is admissible is the best secondary evidence obtainable. If it appears that there is in existence secondary evidence of a more satisfactory kind than the secondary evidence which a party offers, he will. be required to produce the better evidence if he can do so; he will not be permitted to introduce the inferior secondary evidence offered unless he can show that the better secondary evidence, as well as the original primary evidence, is unavailable. Thus, it is conceded that a copy of a copy is not admissible. A true copy is better than parol evidence of the contents of an instrument in writing; and where it can be produced, its production upon the trial will be required. But if the true copy is unobtainable, parol testimony is properly admissible. Whenever a copy of a record or document is itself made original or primary evidence, the rule is clear and well settled that it must be a copy made directly from, or compared with, the original." 20 Am. Jur., Sec. 404, page 365. See also Sec. 405.

It is difficult to see how field agents or even branch managers could testify accurately and in detail as to the contents and status of individual life insurance policies. They may well be cognizant of the general provisions in such policies

and may have personal knowledge of the status of applications, but, handling so many varied accounts, it is difficult to see how they might have personal knowledge of each individual policy and its status. Applications are sent to the home office and the policies issued therefrom. Sometimes such policies are permitted to lapse or are cancelled by the home office. Ofttimes applications are taken and premiums collected by these agents, only to have the home office refuse to issue the contract of insurance and return applicant's premium. Whether or not these policies were in effect at the time of death was a vital question, in that, should it develop that the policies had lapsed, the State's contention that appellant killed for insurance would fail as a motive. Under the testimony, the premiums were past due on all of the policies; therefore, the date on which the grace period would expire was most vital. To permit employees of the insurance companies to testify to the detailed contents of written contracts and on such vital questions allows too much room for error, the memory of man being fickle at best, and such is not within the concepts of the best evidence rule.

The prosecution made no showing that a copy or duplicate could not be produced, which in my opinion would have been the next best evidence. In *Bank v. North Carolina Mutual Life Insurance Company,* 186 S. C. 394, 195 S. E. 649, 650, the Court stated: "It was admitted by all parties to the action that the original policy, No. 713795, was lost or destroyed. In an abundance of caution, appellant had given respondent notice to produce, and in the event of her failure so to do, secondary evidence of the contents thereof would be offered. Of curse, under the circumstances, the best evidence of the contents of the policy, was (1) a duplicate; (2) a copy."

I have gone rather fully into the proceedings in order to show the important aspect these insurance policies and their contents assumed in the trial of this case.

I am of the opinion that such proof of the existence of insurance contracts, and their contents, on the life of the deceased by district managers and field agents was a violation of the best evidence rule, the best evidence being a duplicate or a copy, and that exception 12 should be sustained and a new trial ordered.