16884

STATE v. GOODSON

(82 S. E. (2d) 804)

Messrs. *Blease Ellison,* of Lexington, and *Yarborough & McGowan,* of Florence, *for Appellant,*

*Hubert E. Long, Esq., Solicitor,* of Leesville, *for Respondent,* 

June 28, 1954.

STUKES, Justice.

The appellant was convicted of burglary and larceny and his appeal is concerned solely with the sufficiency of the evidence for submission to the jury; error is imputed to the trial judge for denial of motions for directed verdict of not guilty and for judgment *non obstante veredicto.* Consideration of the appeal therefore requires some review of the evidence.

A resident of Batesburg had in a closet in his home a small safe (a fraction over twenty inches in width and depth and thirty inches in height, outside measurements) in which were $2,800.00 in currency, insurance policies and other papers. He and his wife left their home at about seven P.M. on October 5, 1951, and were away only about an hour. Upon their return they found that it had been broken into and the safe removed. They called the town police who summoned State law enforcement officers, and they called in the sheriff next day. The State and county officers thereafter cooperated in the investigation.

Motor vehicle tracks at the front of the house indicated that the safe was loaded on a vehicle there. A locally owned pickup truck, stolen from another apparently for the purpose, was found next day abandoned about fifteen miles

southwest from Batesburg. A few days later the safe was found, broken open and empty, at a remote location six miles east of Blaney, in Kershaw County, which is on U. S. Highway No. 1, a main route between Batesburg and Hartsville, the important significance of which will be later seen. The safe was back of a Negro church about three miles off that highway and three-fourths of a mile from an alternate route known as the Percival or Fort Jackson road which is about the same distance and carries little traffic. None of the contents of the safe was found. It was put in evidence and the sheriff and his deputies brought it into the court room at the time of trial. Its weight was variously estimated by several witnesses at from 150 to 500 pounds.

The stolen safe was painted green and the officers found in the trunk of appellant's Ford automobile, and on the rear bumper, particles of similar paint which they collected from the trunk and sent to the laboratory of the Federal Bureau of Investigation in Washington along with separate sample of paint scraped from the safe. Meanwhile, they impounded the automobile. An agent of the F.B.I., assigned to its Washington laboratory and long trained and experienced in such, testified that he examined the paint scrapings and chips under a microscope, determined the number, composition and color, of the three coats or layers of the paint, which were a primer, a wrinkle-finish enamel and a lacquer; and the particles of paint which were obtained from the trunk of appellant's automobile and those from the safe were the same. Micro-chemical tests also showed that the pigments in the three layers of paint were the same. The samples of paint were finally compared by the use of a spectograph which is used for determining the composition of paint which is burned and the light given off is characteristic of the elements present and is indistinguishable to the naked eye. The spectographic examination of the light given off by the burning samples in this case showed that the paint taken from the trunk of appellant's automobile and that taken from the safe were of the same composition, contained the

same elements. In summary, the testimony of this expert was that the paint was determined, by the described scientific tests, to be the same. Appellant offered no explanation of the presence of the paint particles in and about the trunk of his car except that he had purchased it secondhand about nine months before; he admitted that he was in the sole possession of it between the time of the crime and the examination and seizure of it by the officers about a week afterward. The automobile, which remained in storage from the time of seizure until the trial, was in evidence and was examined by the jury. Particles of paint, similar to that on the safe, were then still on the bumper of the car.

Appellant testified and also by other evidence attempted to establish an alibi. Formerly a tavern-keeper in Hartsville, he had moved to Batesburg only about nine months before and, according to his own testimony, was practically without an occupation. He said that he was trying to establish himself as a used automobile dealer but had no place of business, not even space about his home in which he could store cars, and he parked on the street in front of it. He had handled five or six cars and had two on hand at this time. The car in which the paint particles were found was purchased by him several months before from a finance company and, he said, had formerly been badly abused. His contention was that on the evening of the crime he left in this car from his home in Batesburg at about 5:30 and went to his former home in Hartsville where he took his mother to see a high school football game in which his seventeen-year-old son by a former marriage played; the boy lived with his grandmother in Hartsville. The latter testified in support of his father's claimed alibi but their evidence conflicted. The boy said, quoting from his testimony, "I saw him (appellant) at my house, and then at the ball game, and back at the house;" he repeated that he saw appellant before the game. It commenced at eight o'clock and appellant testified that he reached there about eight, maybe five minutes before, got his mother at her home, which was on the

way, and took her with him to the game. He was asked on cross-examination when he first saw his son and his reply was, "Well, I saw him right after I got to the game, and I saw him at the half, and after the game."

Appellant's mother did not testify. She was at Myrtle Beach at the time of the trial and the certificate of a doctor was presented which recited that he had treated her, presumably on the day of the trial or the day before, for hypertension and stated complications; but he did not certify that she was unable to attend court, and no deposition or affidavit of what she would testify to, if present, was offered. Circuit Court Rule 27. The only witness who supported appellant's contention of alibi, except his young son and except his wife who said that he was not at their home, was a resident of Hartsville who testified that he saw appellant at the game at half-time, which inferably was after nine o'clock. The highway distance between Batesburg and Hartsville on the mileage table of the current State Highway Department official map is 102 miles; a defendant's witness said that it is 103 miles. Appellant testified that he ordinarily drove at 60 miles per hour. Manifestly, there was ample time for him to have committed the crime, deposited the safe where it was found and thereafter reached Hartsville by half-time of the football game which commenced at eight o'clock. It is uncontroverted that he did not return to Batesburg until about noon of the next day.

When questioned by the officers before his arrest appellant refused to give them any details of his whereabouts on the night of the crime but told them instead, in effect, that he would "talk in court"; and he persisted in this attitude although they offered to interview anyone whom he would say he was with at the time of the crime.

The appeal has been argued as if the only evidence which pointed to the guilt of appellant was the identical similarity of the paint found in the trunk of his automobile and that subsequently taken from the safe, together with the fact that

the measurements of the latter made it a close fit in the trunk whereby, in removing it, paint was accidentally scraped off it and in sliding it over the bumper more of the safe's paint was left on the latter. However, the appellant's admitted absence from his home on the night of the crime and the manifest defects in his attempted proof of alibi are further circumstances which the jury might reasonably have considered in reaching their conclusion of guilt. Having adduced the alleged facts of his contended alibi, they were for the consideration of the jury.

Upon appeal from refusal of motions to direct the verdict and set it aside the evidence must be considered in the most favorable light for conviction. *State v. Smith,* 220 S. C. 224, 67 S. E. (2d) 82. The following pertinent quotation is from *State v. Riley,* 219 S. C. 112, 64 S. E. (2d) 127, 128: "When considering a motion for a directed verdict in favor of a defendant, it is not the function of the Court to pass upon the weight of the evidence, but to determine its sufficiency to support the verdict. Where there is any evidence, however slight, on which the jury may justifiably find the existence or non-existence of material facts in issue, or if the evidence is of such character that different conclusions as to such facts reasonably may be drawn therefrom, the issue should be submitted to the jury. *State v. Prince,* 165 S. C. 115, 162 S. E. 777; *State v. Gellis,* 158 S. C. 471; 155 S. E. 849; *State v. Rush,* 129 S. C. 43, 123 S. E. 765. The general rule is that, if there be any evidence tending to prove the fact in issue or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury. *State v. Roddey,* 126 S. C. 499, 120 S. E. 359; *State v. Villepigue,* 127 S. C. 392, 121 S. E. 258; *State v. Walker,* 138 S. C. 293, 136 S. E. 215."

It is mistakenly contended by appellant that the jury could have only arrived at their verdict by improperly mounting a presumption upon a presumption, hav-

ing reference to the identity of the paint in the automobile and on the safe as raising a presumption of appellant's possession of the safe, which was stolen by burglary of the owner's home, whereby appellant's guilt of the theft of it may have been presumed. But the identity of the paint was circumstantial evidence, not presumption, of the possession of the safe by appellant. "A fact found from circumstantial evidence may be used as a basis for a presumption." 31 C. J. S., Evidence, § 116, p. 731.

Generally applicable to this case is the following from the opinion in *State v. Shields,* 217 S. C. 496, 499, 500, 61 S. E. (2d) 56, 58 : "Counsel for appellant in their brief frankly state that 'possession of the recently stolen safe in Claude Shields may be assumed,' but it is contended that while such possession may be some evidence of participation in larceny, it affords no support for a conclusion that appellant committed burglary. We have held to the contrary. *State v. Campbell,* 131 S. C. 357, 127 S. E. 439; *State v. Baker,* 208 S. C. 195, 37 S. E. (2d) 525; *State v. Kimbrough,* 212 S. C. 348, 46 S. E. (2d) 273. These decisions are in accord with the general rule elsewhere. *McNamara v. Henkle,* 227 U. S. 520, 33 S. Ct. 146, 57 L. Ed. 330; 9 Am. Jur., Burglary, Sections 60, 64, and 74."

And we think that insofar as the verdict here was dependent upon circumstantial evidence, the latter was sufficient to sustain it. The following from *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769, was quoted with approval in *State v. Washington,* 220 S. C. 442, 446, 68 S. E. (2d) 400, 401 : " 'But all that we should require of circumstantial evidence is that there shall be positive proof of the facts from which the inference of guilt is to be drawn, and that inference is the only one which could reasonably be drawn from the facts. All the circumstances taken together must point in the direction of guilt to a moral certainty to the exclusion of any other reasonable hypothesis'." There was no exception to the court's charge to the jury and it is not included in the appeal record. It is therefore assumed

that it contained full and accurate instructions relating to the rules which govern the nature and adequacy of circumstantial evidence to convict of crime. Cf. *State v. Baker, supra,* 208 S. C. 195, 37 S. E. (2d) 525.

Affirmed.

TAYLOR, OXNER, and LEGGE, JJ., and J. FRANK EATMON, Acting Associate Justice, concur.

J. FRANK EATMON, Acting Associate Justice (concurring).

While it appears that the reasons assigned in the opinion of Justice Stukes are ample to support the conclusions reached by him in this case I believe that it would not be amiss to add a few observations that I have gathered from the record which seem to more fully sustain such conclusions. No useful purpose will be served by restating the facts outlined in his opinion. The writer will content himself with referring to the additional points regarded as important and will repeat only such facts as are deemed necessary to make this discussion intelligible.

The case here centers around the theft of a safe from the home of one Calvin Warren, Batesburg, South Carolina. It was later found hidden near Columbia in Kershaw County. The state contended that at some point after the safe was taken from Warren's home the defendant placed the same in the trunk of his 1949 model Ford automobile and transported it to the place where it was later found. In this connection paint allegedly from the trunk of the automobile and from the bumper thereof was found which was supposedly scraped from the safe while it was being placed in or taken out of the trunk. An expert from the Federal Bureau of Investigation testified in this respect and identified the paint in the trunk and on the bumper as being the same as that on the safe. M. N. Cate, Identification Officer of the South Carolina Bureau of Investigation, testified without contradiction that he measured the trunk of the defendant's automobile and also the safe in question. Such measurements conclu-

sively established that the compartment was sufficient to accommodate the stolen article. The latter testimony was corroborative of the other evidence that placed the stolen property in the defendant's possession. If the measurements had shown that the compartment would not admit the safe this would have been some evidence that the defendant did not have possession thereof, as contended for by the State.

Several days after the theft defendant was arrested and incarcerated in the Lexington County jail. Immediately following his imprisonment, according to one of the witnesses for the state who was also in jail at the same time, the defendant was interrogated by another prisoner as to why he (Goodson) was being jailed. Discussion between the latter is detailed as the same appears in the record, to wit:

"Q. Tell us just what you know, from your own knowledge, your own, hearing, of the defendant here? A. Well, they brought him in. The other boy asked him what they had him (Goodson) for. He said, 'Suspicion.' He asked him, 'What for?' He said, 'Safe robbing.' He asked him was he guilty. He said, 'They haven't proved anything.'

"Q. Said what? A. Said, 'They haven't proved anything.'

"Q. Go ahead. A. And he asked him something else, I don't remember exactly what it was, now. Let's see. He asked him, 'Well, are you guilty?' He said, 'They haven't proved anything.' He said, 'Are they?'

"Q. Said what? A. Said, 'Are they going to prove anything?' He said, 'I'll talk when I go to court.' In other words, I don't know whether anybody else was probably mixed up in it or not.

"Q. Well, what else; did he say anything else to you? A. He never said anything to me.

"Q. To the other fellow, that you overheard the conversation? A. Not too awful; I can't quote it.

"Q. Said what? A. I say he didn't say too much that— I mean, I can't remember right now.

"Q. But you say he said he wouldn't take the rap, is that right? A. Something like that."

It is important to note that the defendant did not deny the alleged conversation with his fellow prisoner nor did he attempt to make any explanation whatever thereabout. Certainly the defendant was not under any compulsion insofar as his fellow prisoner was concerned at the time of this alleged conversation. While the conversation attributed to the defendant is susceptible of more than one inference such posed a question for the jury to determine whether the same inferred his guilt or innocence. The jury could have concluded that the evasive answers given by the defendant and his failure to unequivocally assert his innocence on that occasion was some evidence of his guilt.

The principal witness for the defendant on his plea of alibi was his young teen-age son who on the night in question engaged in a game of football at Hartsville. The witness testified that he saw his father, defendant, first at the home of his grandmother, then at the ball game, and later back at the home. The game started at 8:00 o'clock and was over between 10:00 and 10:30 o'clock that night. When the witness was pressed on cross-examination he was asked whether or not he remembered talking to Lieutenant Roy F. Williams of the State Constabulary and he replied in the affirmative. He was then asked whether he remembered telling Lieutenant Williams that he had not seen his father, defendant, that night until 10:15 o'clock, and to this he answered in the negative. At this point the solicitor asked the witness the following question, and received the reply quoted below, to wit:

"Q. You don't remember telling him that, that you said that you did not see your father until after the game, between 10:15 and 10:30? Do you deny telling him that; yes or no? A. No."

If the jury believed that the witness had made different statements on other occasions this would be a circumstance for them to consider as affecting the credibility of this witness and might have been sufficient to convince the jury that he was not telling the truth during the trial.

Witness Taulbee for the State testified that the defendant made threats against the prosecuting witness and against this witness between the time of his arrest and the date of the trial, apparently in an effort to keep them from testifying against him in the trial. Evidence that a person charged with crime procured or attempted to procure absence of a witness or to bribe or suppress testimony against him tends to show unrighteousness of defendant's cause and a consciousness of guilt. *McMillan v. Commonwealth,* 188 Va. 429, 50 S. E. (2d) 428. It may be readily conceded that the witness made contradictory statements during the course of his examination and cross-examination with reference to such threats but it was the province of the jury, and not the province of the Court, to say on which occasion the witness was telling the truth. Certainly if the jury concluded that the defendant had threatened the prosecuting witness and this other witness these would be material circumstances bearing upon the guilt of the defendant.

All of the foregoing appear to be relevant links in the chain of circumstances that linked the defendant to the crime charged. The judgment below should be affirmed.